1

The Honorable Richard A. Jones

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                          WESTERN DISTRICT OF WASHINGTON

9                                    AT SEATTLE

10

*In re Former Employees of Washington*    Master File No. C09-0504 RAJ
11  *Mutual Bank v. FDIC as Receiver for*
*Washington Mutual Bank, et al.*    **MOTION PURSUANT TO FRCP 12(b)(6)**
12  **AND FOR JUDGMENT ON THE**
**PLEADINGS PURSUANT TO FRCP 12(c)**
13  **TO DISMISS ALL CLAIMS AGAINST**
**DEFENDANT FEDERAL DEPOSIT**
14  **INSURANCE CORPORATION, AS**
**RECEIVER FOR WASHINGTON**
15  **MUTUAL BANK**

16  Note Date:      December 16, 2009
    Oral Argument:   January 22, 2010
17                      9:00 a.m.

18

19

20

21

22

23

24

25

26

RECEIVER'S MOTION TO DISMISS            DLA Piper LLP (US)
Master File No. C09-0504-RAJ           701 Fifth Avenue, Suite 7000
                                 Seattle, WA  98104 • Tel: 206.839.4800

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT    ……………………………..1

II.    FACTUAL BACKGROUND……………………………………………………………….3

    Change-In-Control Agreements……………………………………………………...6

    Severance Plan Agreements………………………………………………………….7

    Retention Agreements…………………………………………………………………9

    All Of Plaintiffs' Employment Agreements Are Materially The Same……………....10

    Causes Of Action Asserted By Plaintiffs Against The Receiver………………….....10

III.    AUTHORITY AND ARGUMENT………………………………………………….....12

    A.    Applicable Legal Standards……………………………………………...……12

    B.    Plaintiffs' Claims Fail As A Matter Of Law Under 12 C.F.R. § 563.39……....13

        1.    All Of Plaintiffs' Employment Contracts That Are At Issue In This
            Lawsuit Terminated By Operation Of Law On September 25, 2008.....14

        2.    None Of Plaintiffs' Claims Vested Prior To Termination……………..17

    C.    All Of Plaintiffs' Alleged Causes Of Action Should Be Dismissed On This Rule
        12 Motion………………………………………………………………………...21

D.    Section 563.39's History Evidences Congress' And Regulatory Authorities' Clear
    Intention That Claims Such As Plaintiffs' Here Should Be Dismissed………………24

IV.    CONCLUSION…………………………………………………………………………..26

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

C<small>ASES</small>

4

*Abagninin v. AMVAC Chemical Corp.*,
5
   545 F.3d 733 (9th Cir. 2008)……………………………………………...............12, 13

6

*Aronson v. Resolution Trust Corp.*,
   38 F.3d 1110 (9th Cir. 1994) …………………………………………... 15, 16, 19, 20

7

*Augienello v. Coast-to-Coast Financial Corp.*,
8
   2002 WL 1822926 (S.D.N.Y. 2002) ……………………………………...............20

9

*Balistreri v. Pacifica Police Dep't*,
   901 F.2d 696 (9th Cir. 1988) ………………………………………………...........12
10

11

*Barnes v. Resolution Trust Corp.*,
   1992 WL 25203 (D. Kan. 1992) …………………………………………………..15, 20

12

*Borodinsky v. Resolution Trust Corp.*,
13
   1992 WL 5218 (D.N.J. 1992) ……………………………………………...........20

14

*Crocker v. Resolution Trust Corp.*,
   839 F.Supp. 1291 (N.D. Ill. 1993) …………………………………………...16, 20
15

16

*Del E. Webb McQueen Development Corp. v. Resolution Trust Corp.*,
   69 F.3d 355 (9th Cir. 1995) …………………………………………………...............14

17

*Dworkin v. Hustler Magazine Inc.*,
18
   867 F.2d 1188 (9th Cir. 1989) ……………………………………………...........12

19

*Federal Savings & Loan Ins. Corp. v. Quinn*,
   711 F. Supp. 366 (N.D. Ohio 1989) ………………………………………………..20
20

21

*Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*,
   458 U.S. 141, 102 S.Ct. 3014 (1982) …………………………………………………14

22

*Fleisher v. Federal Deposit Ins. Corp.*,
23
   113 F.3d 168 (10th Cir. 1996) ……………………………………………..20

24

*Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228 (9th Cir. 1989) …………………………………………...12

25

*Great Western Bank v. Office of Thrift Supervision*,
26
   916 F.2d 1421 (9th Cir. 1990) …………………………………………………13, 24

*Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*,
   896 F.2d 1542 (9th Cir. 1990) ……………………………………………………..12

*Hoeft v. Tucson Unified Sch. Dist.*,
   967 F.2d 1298 (9th Cir. 1992) ……………………………………………………..13

*Kruger v. Horton*,
   106 Wn.2d 738, 725 P.2d 417 (1986) ……………………………………………..22

*Lapidus v. Hecht*,
   232 F.3d 679 (9th Cir. 2000) ……………………………………………………….4

*MGIC Indem. Corp. v. Weisman*,
   803 F.2d 500 (9th Cir. 1986) ……………………………………………………….4

*Modzelewski v. Resolution Trust Corp.*,
   14 F.3d 1374 (9th Cir. 1994) …………………………………………………..passim

*Nugget Hydroelectric v. Pacific Gas & Elec.*,
   981 F.2d 429 (9th Cir. 1992) ……………………………………………………….3

*Robertson v. Kulongoski*,
   359 F. Supp.2d 1094 (D. Or. 2004) ………………………………………………..21

*Romines v. Great-West Assur. Co.*,
   73 F.3d 1457 (8th Cir. 1996) ………………………………………………….15, 20

*Rush v. Federal Deposit Ins. Corp.*,
   747 F. Supp. 575 (N.D. Cal., 1990) …………………………………………….3, 15

*Sgro v. Danone Waters of North America, Inc.*,
   532 F.3d 940 (9th Cir. 2008) ……………………………………………………….4

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) ……………………………………………………..13

*United States v. Southern California Edison Co.*,
   300 F. Supp. 2d 964 (E.D. Cal. 2004) ……………………………………………..4

*Wilde v. First Federal Sav. & Loan Ass'n*,
   134 Ill. App.3d 722 (Ill. Ct. App. 1985) ………………………………………….20

**STATUTES**

12 U.S.C. § 1813……. ……………………………………………………….16

12 U.S.C. §1828………………………………………………………….....25, 26

THE RECEIVER'S MOTION TO DISMISS
PURSUANT TO FRCP 12(b)(6) AND FOR
JUDGMENT ON THE PLEADINGS PURSUANT
TO FRCP 12(c) - ii
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1
2

FIRREA, Pub. L. No. 101-73, 103 Stat. 183 (Aug. 9, 1989) ……………………..……13, 24

3

**OTHER AUTHORITIES**

4

12 C.F.R. § 359……………………………………………………………..……26
5

12 C.F.R. § 563.39…………………………………………………………………....passim
6

39 Fed. Reg. 28609 (Aug. 9, 1974) ………………………………………..……..24
7

39 Fed. Reg. 28610 (Aug. 9, 1974) ………………………………………….…......24
8

46 Fed. Reg. 9917 (Jan. 30, 1981) ………………………………………………..24
9

47 Fed. Reg. 17471 (Apr. 23, 1982) ……………………………………….……..24
10

54 Fed. Reg. 49411 (Nov. 30, 1989) ……………………………………....…….14, 25
11

136 Cong. Rec. E3684-02, E3687, 1990 WL 206971 (Cong. Rec.) (October 27, 1990)………25
12

136 Cong. Rec. H4385-02, H4388, 1990 WL 92250 (Cong. Rec.) (June 28, 1990)………...26

13
14
15
16
17
18
19
20
21
22
23
24
25
26

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1    Defendant Federal Deposit Insurance Corporation, as Receiver for Washington Mutual

2   Bank (the "Receiver"), respectfully submits this motion to dismiss pursuant to FED. R. CIV. P.

3   12(b)(6) and for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c), to dismiss all

4   claims against the Receiver (the "Motion").[1]   This Motion seeks an order from the Court

5   dismissing, with prejudice, plaintiffs' claims asserted against the Receiver in this consolidated

6   lawsuit.

7   ## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

8    Plaintiffs' claims are barred, as a matter of law, by an on-point federal regulation

9   governing contracts between a thrift institution and its employees.    Under the federal

10   regulation, plaintiffs have no entitlement to change-in-control payments because vesting – as

11   interpreted by the Ninth Circuit Court of Appeals – of such contingent payments did not occur

12   ***prior to*** the date the Office of Thrift Supervision ("OTS") determined plaintiffs' employer bank

13   to be "in an unsafe or unsound condition."

14    The Court needs only three tools to dispose of plaintiffs' claims: (1) the regulation,

15   12 C.F.R. § 563.39, (2) the OTS's September 25, 2008 Order finding Washington Mutual

16   Bank, Henderson, Nevada ("WMB") to be "in an unsafe or unsound condition" (which federal

17   Order is the proper subject of judicial notice on a Rule 12 motion), and (3) plaintiffs' contracts,

18   (also properly considered on a Rule 12 motion because they are referenced in the respective

19   complaints).    Together, the federal regulation, the OTS's Order, and plaintiffs' contracts

20   mandate dismissal of the claims against the Receiver in this lawsuit with prejudice, as a matter

21   of law.

22    The issues raised in this consolidated lawsuit, and through this Motion, are simple.    All

23   plaintiffs in this consolidated lawsuit are former employees of WMB, a former subsidiary of

24   Washington Mutual, Inc.  All of plaintiffs' claims arise out of employment agreements they had

25

26   _____

[1]   Two of the complaints were recently amended, and the Receiver has not yet answered those amended
complaints, thus making a Rule 12(b)(6) motion proper.  The Receiver has answered the other 16 complaints, thus
making a Rule 12(c) motion proper.

RECEIVER'S MOTION TO DISMISS - 1
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1   with WMB.  Each plaintiff alleges he/she is entitled to payment of certain employment benefits

2   that, under certain circumstances, were to arise under those employment agreements.

3          WMB was a federally chartered thrift that was overseen by the OTS, and was subject to

4   OTS regulation.  On September 25, 2008, by Order of the OTS, the Director of the OTS found

5   and determined WMB to be in an unsafe or unsound condition to transact business, seized

6   WMB, and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver for

7   WMB.  Since that date, the FDIC has acted in its capacity as Receiver for the failed WMB, and

8   has administered the affairs of the failed institution.  According to plaintiffs' complaints, each

9   plaintiff filed a claim with the Receiver to be paid employment benefits that plaintiffs claim are

10  due under their former employment agreements with WMB.  The Receiver denied plaintiffs'

11  claims, and plaintiffs filed numerous lawsuits in this District that were consolidated into this

12  consolidated lawsuit.

13         The question in this consolidated lawsuit is whether plaintiffs are entitled to payment of

14  the employment benefits they claim they are owed.  There are numerous reasons the answer to

15  that question is No.  But one reason is so clear, as a matter of law, that it compels dismissal of

16  plaintiffs' claims against the Receiver on this Rule 12 motion.

17         Over thirty-five years ago, the OTS's predecessor, the Federal Home Loan Bank Board

18  (the "FHLBB"), promulgated a simple regulation.  That regulation – 12 C.F.R. § 563.39

19  ("Section 563.39") – governs contracts between thrifts and their employees.  The purpose of

20  Section 563.39(b) is so plain that it is commonly referred to as the "Automatic Termination

21  Provision" for thrift employment agreements.

22         Under the Automatic Termination Provision of Section 563.39, the moment certain

23  events occur, such as when the OTS Director determines a thrift is in "default" or in an "unsafe

24  or unsound condition," all obligations under employment agreements of the failed thrift (with

25  narrow exceptions not applicable here) are ***automatically terminated***, and only rights that were

26  not contingent and vested ***prior to*** the OTS Director's determination are not extinguished.  On

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1    September 25, 2008, the OTS Director determined WMB was in default and in an "unsafe or

2    unsound condition" to transact business.   Thus, at that moment, all of WMB's employment

3    agreements terminated by operation of law.   The only obligations that remained under those

4    employment agreements were such obligations, if any, that had vested **prior to** September 25,

5    2008.  The Ninth Circuit has squarely held that the benefits plaintiffs here claim (*i.e.*, change-

6    in-control payments) do not vest **prior to** the OTS action, as a matter of law.

7        In short, all purported employment benefits that plaintiffs seek to recover through this

8    consolidated lawsuit were automatically terminated on September 25, 2008, and the only way

9    plaintiffs could even arguably be entitled to payment of those "benefits" is if the right to

10   receive such payment was not contingent but existed (*i.e.*, had "vested") **prior to** September 25,

11   2008.  Because the purported employment "benefits" at issue in this consolidated lawsuit did

12   not vest prior to September 25, 2008,  plaintiffs' claims fail as a matter of law.  The Court

13   should grant this Motion and dismiss plaintiffs' claims with prejudice.

14   **II.    FACTUAL BACKGROUND**

15       On September 25, 2008, the Director of the OTS issued an Order that found and

16   determined WMB, a federal thrift, to be "in an unsafe or unsound condition" because of

17   WMB's "severe liquidity strain, deteriorating asset quality, and continuing significant negative

18   operating earnings with no realistic prospects for raising capital to ensure that it can repay all of

19   its liabilities, including deposits."   *See* OTS Order No. 2008-36, attached as Ex. A to the

20   Declaration of Stellman Keehnel in Support of Motion to Dismiss Pursuant to FRCP 12(b)(6)

21   and for Judgment on the Pleadings Pursuant to FRCP 12(c) (the "Keehnel Decl."), filed

22   herewith.[2]  Accordingly, "[t]he Director of the Office of Thrift Supervision …, in cooperation

23

24   [2]  The OTS Order is the proper subject of judicial notice on this motion, and the Receiver respectfully requests that
     the Court take judicial notice of OTS Order No. 2008-36.  Courts may properly take judicial notice of OTS orders

25   and resolutions on a Rule 12 motion without converting it to a Rule 56 motion.  *See Rush v. Federal Deposit Ins.
     Corp.*, 747 F. Supp. 575, 577 (N.D. Cal. 1990) ("Defendants request the Court to take judicial notice of Federal

26   Home Loan Bank Board Resolution Nos. 87-475 & 87-476 (Apr. 24, 1987), and attach copies of these resolutions.
     The Court takes notice of these resolutions pursuant to Federal Rule of Evidence 201(d)."); *Nugget Hydroelectric
     v. Pacific Gas & Elec.*, 981 F.2d 429, 435 (9th Cir. 1992) (court took judicial notice of regulatory decisions/orders

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1    with the Federal Deposit Insurance Corporation[,] … determined to appoint the FDIC as

2    receiver of Washington Mutual Bank …."  *Id.*  The FDIC has acted as the Receiver for the

3    failed WMB since its appointment on September 25, 2008.

4         After being appointed Receiver, on September 25, 2008, the Receiver entered into a

5    Purchase and Assumption Agreement with JPMorgan Chase Bank, N.A. (the "P&A

6    Agreement").  *See* Day Complaint, Case No. C09-0684, ¶4.  As alleged in the various

7    complaints, the plaintiffs in this consolidated lawsuit continued in their bank jobs, but through a

8    new division of JPMorgan Chase.  Over the course of the next several months, as alleged by

9    plaintiffs, each of the plaintiffs' employment with JPMorgan Chase was terminated.[3]

10        Thereafter, according to plaintiffs, each plaintiff submitted an administrative claim with

11   the Receiver.  Plaintiffs each allege that he/she timely and properly filed his/her administrative

12

13   ─────────────────────────────────────────

14   on Rule 12 motion); *United States v. Southern California Edison Co.*, 300 F. Supp. 2d 964, 975 (E.D. Cal. 2004)
     (court judicially noticing regulatory orders on Rule 12 motion); *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500,

15   504 (9th Cir. 1986) ("On a motion to dismiss, we may take judicial notice of matters of public record outside the
     pleadings.").  Courts regularly take judicial notice of federal regulatory orders because such orders fit precisely the
     contours of FRE 201(b) ("not subject to reasonable dispute" because "capable of accurate and ready determination

16   by resort to sources whose accuracy cannot reasonably be questioned.").  As in the above-noted precedents and in
     legions of additional authorities, consideration of such matters of public record does not convert a Rule 12 motion

17   to a Rule 56 motion.  *See, e.g., Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986), overruled
     on other grounds by *Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166 (1991) ("on a

18   motion to dismiss a court may properly look beyond the complaint to matters of public record and doing so does
     not convert a Rule 12(b)(6) motion to one for summary judgment"); *Intri-Plex Technologies, Inc. v. Crest Group,*

19   *Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) ("'[a] court may take judicial notice of 'matters of public record' without
     converting a motion to dismiss into a motion for summary judgment,' as long as the facts noticed are not 'subject to

20   reasonable dispute.'") (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)).

21       In addition, plaintiffs reference OTS Order No. 2008-36 in their various complaints, both by name and by
     reference to the OTS's action.  *See, e.g.*, Bjorklund Complaint, Case No. C09-691, ¶ 15 ("On or around September

22   25, 2008, . . . WMB was seized by the Director of the Office of Thrift Supervision by Order No. 2008-36"); Day
     Complaint, Case No. C09-684,  ¶ 10 ("the OTS, by order number 2008-36, took control of WMB").  Thus, the

23   Court can properly consider OTS Order No. 2008-36 on this Rule 12 motion (without converting it to a Rule 56
     motion) for the second, independent reason that the OTC Order is referenced in the complaints.  *See Sgro v.*

24   *Danone Waters of North America, Inc.*, 532 F.3d 940, 943 (9th Cir. 2008) (on a Rule 12 motion to dismiss, the
     court can consider documents plaintiff "refers to … in his complaint"); *Lapidus v. Hecht*, 232 F.3d 679, 682 (9th

25   Cir. 2000) (on a Rule 12 motion, the court can consider "documents whose contents are alleged in a complaint and
     whose authenticity no party questions, but which are not physically attached to the pleading" (quoting *Branch v.*

26   *Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994))).

     [3]  *See, e.g.*, Collins Amended Complaint, Case No. C09-0570,  ¶ 13 ("Most of the plaintiffs continued to work for
     WMB after the change of control until their termination by JPMorgan Chase after the transfer from FDIC.").

     RECEIVER'S MOTION TO DISMISS - 4                    DLA Piper LLP (US)
     Master File No. C09-0504-RAJ                         701 Fifth Avenue, Suite 7000
                                                          Seattle, WA  98104 • Tel: 206.839.4800

claim.[4]  While differing slightly from claim to claim, in essence, each claim submitted to the Receiver sought payment for certain contingent employment benefits under each plaintiff's employment agreement with WMB.[5]  The Receiver denied those claims as not valid receivership claims.[6]  This consolidated lawsuit followed.[7]

### The Employment Agreements

Three types of agreements are at issue here — Change-In-Control Agreements, Severance Plan Agreements, and Retention Agreements.  Each plaintiff allegedly had one or more of these agreements with WMB.[8]  There are no material differences in these employment agreements that would require them to be treated any differently on this Motion.[9]

---

[4]  *See*, *e.g.*, Wyckoff Complaint, Case No. C09-0689, ¶ 10 ("each of the above-named plaintiffs filed claims with the FDIC to recover funds due and owing").  Whether each plaintiff submitted a timely and proper claim with the Receiver is not at issue in this Motion.  The Receiver does not concede that each plaintiff timely and properly submitted a claim.

[5]  *See*, *e.g.*, Melby First Amended Complaint, Case No. C09-0750, ¶ 21 ("Plaintiffs filed claims with the FDIC to recover funds due and owing based on the change of control contract and other liabilities of the FDIC."); Thompson Complaint, Case No. C09-0715, ¶ 9 ("plaintiff filed a claim with the FDIC to recover funds due and owing based upon the change of control").

[6]  *See*, *e.g.*, Conway Second Amended Complaint, Case No. C09-0781, ¶ 23 (the Receiver "refus[ed] to honor Plaintiffs' claims"); Day Complaint, Case No. C09-0684, ¶ 4 ("Plaintiff filed an administrative claim against the receivership …, and this action was commenced [as a result of] disallowance of that claim"); Herres Complaint, Case No. C09-0798, ¶ 10 (the Receiver "refus[ed] to honor the plaintiff's claim under the change in control clauses of their contracts").

[7]  In total, nineteen separate lawsuits were filed by plaintiffs in this District – Case Nos. C09-0504, C09-0528, C09-0543, C09-0553, C09-0568, C09-0570, C09-0573, C09-0684, C09-0689, C09-0691, C09-0692, C09-0711, C09-0715, C09-0750, C09-0781, C09-0798, C09-0827, and C09-0866.  One of those lawsuits, C09-827, was dismissed as a duplicative lawsuit, with prejudice, on August 25, 2009, pursuant to stipulation of the parties.  The remaining eighteen lawsuits were consolidated into this consolidated lawsuit, bearing Master File No. C09-0504, by Order of this Court on September 2, 2009.

[8]  Most plaintiffs had only a Change-In-Control Agreement with WMB.  A relatively small number of plaintiffs had a Retention Agreement.  Even fewer had a Severance Plan Agreement with WMB.  A handful of plaintiffs had more than one of these types of agreements with WMB, but the majority of plaintiffs had only a Change-In-Control Agreement.  So the Court is clear on which plaintiffs had which employment agreements, for the Court's convenience, the Receiver has attached as Exhibit B to the Keehnel Declaration a chart listing each plaintiff and the type of employment agreement he or she had with WMB.

[9]  In addition to the chart provided at Exhibit B of the Keehnel Declaration, copies of each of the employment agreements the Receiver has received in this consolidated lawsuit are attached to the Keehnel Decl., Exhibits J to O.

RECEIVER'S MOTION TO DISMISS - 5
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1    The structure common to all three types of agreements is that if specified triggering
2    events occurred, specified payment would be made to the employee.  For Change-In-Control
3    Agreements, the specified triggering event was a change-in-control event plus termination of
4    the employee's job within a certain amount of time after that change-in-control event.

5    Severance Plan Agreements and Retention Agreements contained change-in-control
6    provisions with the same trigger as the Change-In-Control Agreements.  In addition, Severance
7    Plan Agreements and Retention Agreements also provided for payments upon other specified
8    triggering events that did not necessarily require a change-in-control, but none of those
9    additional triggering events occurred.  The three different types of agreements are described in
10   greater detail below.

11   <u>None</u> of the necessary triggering events, under <u>any</u> of the three types of employment
12   agreements, occurred before the agreements were automatically terminated by Section 563.39.
13   Thus, as discussed in Part III.B below, all of plaintiffs' claims, under all three types of
14   employment agreements, are barred by Section 563.39.

15                      ***Change-In-Control Agreements***

16   By far the predominant type of employment agreement that existed between WMB and
17   plaintiffs was a Change-In-Control Agreement.  The plaintiffs who had such agreements were
18   to receive a lump-sum payment of 150% (in some agreements) or 200% (in other agreements)
19   of their annual salary *if* there was a change-in-control event, as defined by the agreements, ***and***
20   ***if*** their employment terminated within 18 months (in some agreements) or two years (in other
21   agreements) of that change-in-control event.  Thus, a right to payment under the Change-In-
22   Control Agreements ***did not exist*** (*i.e.*, ***did not vest***) unless and until there was a change-in-
23   control event <u>and</u> termination of the employee within a defined period of time after that
24   change-in-control event.

25

26

The Change-In-Control Agreements at issue in this consolidated lawsuit contain the following triggering language (or language that is materially the same for purposes of this Motion):

> If (i) Employee's employment is terminated by Washington Mutual or its successor without "cause" … or (ii) Employee resigns for "good reason" … within two years after a Change in Control …, then Employee shall be entitled to receive …, from Washington Mutual or its successor, a lump sum equal to two times Employee's annual compensation.

*See* Keehnel Decl., Ex. C (Plaintiff Freilinger's Change-In-Control Agreement § 5(c)).[10]

### *Severance Plan Agreements*

A handful of plaintiffs assert claims against the Receiver based on Severance Plan Agreements with WMB.   There are two different types of triggering events under the Severance Plan Agreements.   The first is materially the same as the triggering event in the Change-In-Control Agreements – *i.e.*, a change-in-control and termination of employment.[11] The second did not require a change-in-control event, but triggered upon job elimination under

---

[10]   The Change-In-Control Agreements define "Change in Control" as follows (or in materially the same way):

> 1.   The acquisition of ownership, directly or indirectly, beneficially or of record, by any Person … or group … of [Washington Mutual, Inc.], or its Subsidiaries, of shares representing more than 25% of (i) the common stock of [Washington Mutual, Inc.], (ii) the aggregate voting power of [Washington Mutual, Inc.]'s voting securities or (iii) the total market value of [Washington Mutual, Inc.]'s voting securities;

> 2.   During any period of 25 consecutive calendar months, a [majority change in] the Board of Directors of [Washington Mutual, Inc.];

> 3.   The good-faith determination by the Board that any Person or group … has acquired direct or indirect possession of the power to direct or cause to direct the management or policies of [Washington Mutual, Inc.];

> 4.   The merger, consolidation, share exchange or similar transaction between the Company and another Person [with exceptions not relevant here]; or

> 5.   The sale or transfer (in one transaction or a series of related transactions) of all or substantially all of [Washington Mutual, Inc.]'s assets to another Person (other than a Subsidiary) whether assisted or unassisted, voluntary or involuntary.

*See* Keehnel Dec., Ex. C (Plaintiff Freilinger's Change-In-Control Agreement § 5(g)).   For all purposes material to this Motion, all of plaintiffs' Change-In-Control Agreements are the same as Plaintiff Freilinger's Change-In-Control Agreement.

[11]   The Severance Plan agreements define change-in-control the same as the Change-In-Control Agreements. *Compare* note 10, *supra*, to Keehnel Decl., Ex. D (Plaintiff Bjorklund's Severance Plan Agreement ¶ 1.5).

RECEIVER'S MOTION TO DISMISS - 7
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

certain circumstances – *i.e.*, if "[e]mployee's position is eliminated because of corporate restructuring, downsizing, or a reduction in force and, as a result, his employment with the Company terminates."[12]

The Severance Plan Agreements contain the following triggering language (or language that is materially the same for purposes of this Motion):

> [An employee] will be entitled to Severance Pay equal to one and a half times his annual compensation . . . if his employment is terminated for any reason other than for Cause within 18 months after the Change in Control….

*See*, *e.g.*, Keehnel Decl., Ex. D (Plaintiff Bjorklund's Severance Plan Agreement ¶ 3.2(d)).

> [An employee] will be eligible for benefits … if …[employee's] position is eliminated because of corporate restructuring, downsizing, or a reduction in force and, as a result, his employment with the Company terminates."

*See id.* at ¶¶ 2.1 & 2.3.

Thus, while the Severance Plan Agreements are titled something different and were entered into by a select group of plaintiffs, the Severance Plan Agreements are functionally the same as the Change-In-Control Agreements – *i.e.*, a right to payment under the Severance Plan Agreements **did not exist** unless and until these certain defined events occurred.  As discussed below, there was no change-in-control event triggering payment obligations **prior to** WMB's failure, and plaintiffs' own allegations establish that none of their jobs were eliminated due to corporate restructuring, downsizing, or a reduction in force **prior to** the OTS seizing WMB on September 25, 2008.[13]

---

[12]  *See* Keehnel Decl., Ex. D. (Plaintiff Bjorklund's Severance Plan Agreement ¶¶ 2.1 & 2.3).

[13]  *See*, *e.g.*, Day Complaint, Case No. C09-00684, ¶ 22 (job eliminated January 29, 2009); Freilinger Complaint, Case No. C09-0692, ¶ 14 (job eliminated December 3, 2008).

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1

*Retention Agreements*

2      A small number of plaintiffs assert claims based on Retention Agreements they had

3   with WMB.[14]   While labeled differently, the Retention Agreements have the same features as

4   the Change-In-Control Agreements and the Severance Agreements.  The Retention Agreements

5   provided for payment of employee benefits under either (1) a change-in-control provision that

6   is functionally identical to the Change-In-Control Agreements discussed above, or, in some

7   cases, (2) other provisions where the triggering event for payment was termination or job

8   elimination.

9      The Retention Agreements contain the following triggering language (or language that

10  is materially the same for purposes of this Motion):

11
12          [Y]ou will be [entitled to payment] if, within two years after a change in
            control (as defined in Section 5(g) of your Change In Control ("CIC"
            Agreement), your employment is terminated by the Company or a
13          successor for any reason other than for cause . . . or you resign for good
            reason . . . .
14

15  *See* Keehnel Decl., Ex. F (Plaintiff Laubsted's Retention Agreement, p. 1).

16          [I]f your job is eliminated (as defined in the WaMu Severance Plan [as
            described above]) you will be [entitled to payment.]

17  *See id.*

18
19     In other words, although called something different (a "Retention Agreement"), these

20  agreements, too, are functionally identical to the Change-In-Control Agreements and Severance

21  Plan Agreements – *i.e.*, for a right to payment under these agreements to exist, there had to be a

22  change-in-control event plus termination or, in some cases, the employee's employment with

23

24

25

26  [14]  Although referred to as "Retention Agreements" in this Motion and by plaintiffs, most of the agreements are set
    forth in letters with the following title in the subject line:  "Special Bonus Opportunity."  *See*, *e.g.*, Keehnel Decl.,
    Ex. F (Plaintiff Laubsted's Retention Agreement).

RECEIVER'S MOTION TO DISMISS - 9
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1   WMB had to be eliminated although there was not a change-in-control.  Again, neither of those

2   events occurred before WMB failed on September 25, 2008.[15]

3   ### *All Of Plaintiffs' Employment Agreements Are Materially The Same*

4   As the above discussion reveals, all of the employment agreements underlying

5   plaintiffs' claims provided for benefits that were contingent on triggering events, none of which

6   occurred prior to September 25, 2008.[16]  Thus, for purposes of this Motion, all of plaintiff's

7   employment agreements at issue here are the same.  No plaintiff was entitled to payment under

8   the employment agreements *prior to* September 25, 2008 when WMB failed.  Every plaintiff's

9   alleged entitlements were contingent on events that did not occur *prior to* to the OTS's action.

10  In brief, the claimed benefits did not vest *prior to* the date the employment agreements were

11  extinguished by operation of law.  Thus, plaintiffs' claims should all be dismissed with

12  prejudice.

13  ### *Causes Of Action Asserted By Plaintiffs Against The Receiver*

14  Because this is a consolidated lawsuit that brought together eighteen complaints, not all

15  plaintiffs in this consolidated lawsuit assert the same causes of action against the Receiver.  Yet

16  all of the causes of action arise out of the above-discussed employment agreements, and all of

17  the causes of action fail as a matter of law.  The causes of action asserted against the Receiver

18  are as follows:

---

[15]  *See* Part III.B, below; Williams Complaint, Case No. C09-0504, ¶ 9 (position eliminated February 3, 2009); Zalutsky Complaint, Case No. C09-0866, ¶ 13 (plaintiff continued to work for JPMorgan Chase until terminated); Bjorklund Complaint, Case No. C09-0691, ¶ 17 ("On September 26, 2008, Bjorklund was relieved of his duties").

[16]  One plaintiff, Ms. Kegel, alleges she had a type of agreement with WMB different from the three types of agreements described above.  *See* Melby Complaint, Case No. C09-0750, ¶¶ 26-34 (allegations specific to Debra Kegel).  In addition to her Change-In-Control Agreement, Ms. Kegel alleges she is entitled to payment under three deferred compensation agreements:  an "American Savings Bank Deferred Compensation Plan," an "American Savings Bank Supplemental Executive Retirement Plan," and the "Washington Mutual Supplemental Executive Retirement Accumulation Plan."  *Id.* at ¶¶ 26-28.  On October 15, 2009, for the first time, Ms. Kegel's counsel delivered to Receiver's counsel the "plan" documents for two of these three plans, and the Receiver still has not been provided with the actual contracts.  The Receiver is investigating Ms. Kegel's deferred compensation allegations and, by agreement of the parties, will file a Rule 12 motion on those narrow claims, if appropriate, within 30 days of receiving all documents from Ms. Kegel.

RECEIVER'S MOTION TO DISMISS - 10
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1.   Breach of contract.  All plaintiffs assert a breach of contract claim against the Receiver, alleging the Receiver breached the employment agreement each plaintiff had with WMB by not paying employment benefits.[17]

2.   Wrongful withholding of wages.   Several plaintiffs allege the Receiver wrongfully withheld wages.[18]

3.   Conversion.   One plaintiff alleges the Receiver's "failure" to pay employee benefits under his employment agreement constitutes conversion.[19]

4.   Violation of the Contract Clause of the United States Constitution.  One plaintiff alleges that by not paying employee benefits under the employment agreement the Receiver violated the Contract Clause of the United States Constitution.[20]

5.   Unconstitutional taking.  Plaintiffs in two lawsuits allege that the Receiver's "failure" to pay employee benefits under their employment agreements constituted an unconstitutional taking.[21]

6.   Estoppel (WMB's receiver).  A handful of plaintiffs allege that the Receiver should be estopped from denying their claims because the Receiver must act in WMB's shoes and, according to those plaintiffs, WMB is obligated to pay their claims.[22]

7.   Estoppel (claim denial).  A handful of plaintiffs allege that the Receiver should be estopped from denying their claims because the Receiver allegedly provided inconsistent reasons for such denial.[23]

8.   Disaffirmance of claim ineffective.  A number of plaintiffs allege that the Receiver did not disaffirm their employment contracts within a "reasonable" time.[24]

---

[17]   *See* complaints in Case Nos. C09-0504, C09-0528, C09-0543, C09-0553, C09-0568, C09-0570, C09-0573, C09-0684, C09-0689, C09-0691, C09-0692, C09-0711, C09-0715, C09-0750, C09-0781, C09-0798, C09-0847, and C09-0866. A few plaintiffs articulate their breach of contract cause of action as a "wrongful denial of claims." *See* complaints in Case Nos. C09-0504, C09-0684, C09-0691, and C09-0692.

[18]   *See* Case No. C09-0553, Complaint ¶ 20 ("The monies due and owing from the change of control agreements constitute wages already earned by the plaintiffs."); *see also* complaints in Case Nos. C09-0528, C09-0543, C09-0573, C09-0689, C09-0691, C09-0692, C09-0715, C09-0798, and C09-0847 (similar).

[19]   *See* Complaint in Case No. C09-0692.

[20]   *See* Complaint in Case No. C09-0866.

[21]   *See* complaints in Case Nos. C09-0570 and C09-0866.

[22]   *See* complaints in Case Nos. C09-0711, C09-0750, and C09-0781.  Arguably, this estoppel claim is simply a poorly crafted breach of contract claim.  For the sake of argument, however, it is treated separately in this Motion.

[23]   *See* complaints in Case Nos. C09-0692, C09-0570, and C09-0691.

RECEIVER'S MOTION TO DISMISS - 11
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

As discussed below, each of these purported causes of action is subject to dismissal as a matter of law.

## III.   AUTHORITY AND ARGUMENT

### A.   Applicable Legal Standards

The Receiver brings this Motion pursuant to FED. R. CIV. P. 12(b)(6) and 12(c).[25] Under both Rules 12(b)(6) and 12(c), dismissal is appropriate where plaintiffs do not allege cognizable legal theories, and the moving party is entitled to judgment as a matter of law. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988) (Rule 12(b)(6) dismissal is proper on either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory"); *Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989) (under Rule 12(c), "[j]udgment on the pleadings is proper when there are no issues of material fact, and the moving party is entitled to judgment as a matter of law").  The Ninth Circuit has long held that the standard applied on Rule 12(b)(6) motions and Rule 12(c) motions is the same.  *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990) (recognizing Rule 12(c) standard is same as Rule 12(b)(6) standard); *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) (because Rules 12(c) and 12(b)(6) motions are "functionally identical," the legal standards applicable to both are the same).

Thus, in viewing this motion, "the district court [must] view[] the facts as presented in the pleadings in the light most favorable to the plaintiffs, accepting as true all the allegations in

---

[24]  *See* complaints in Case Nos. C09-0570 and C09-0866.

[25]  Plaintiffs in Case Nos. C09-0781 and C09-0715 recently filed amended complaints that the Receiver has not yet answered.  Thus, the Receiver seeks dismissal of the claims asserted against the Receiver in Case Nos. C09-0781 and C09-0715 pursuant to FED. R. CIV. P. 12(b)(6).  *See Abagninin v. AMVAC Chemical Corp.*, 545 F.3d 733, 737 (9th Cir. 2008) (Rule 12(b)(6) is properly used to challenge allegations in a complaint before an answer is filed).

  Due to procedural delays related to consolidation, the Receiver has answered the remaining sixteen complaints in Case Nos. C09-0504, C09-0528, C09-0543, C09-0553, C09-0568, C09-0570, C09-0573, C09-0684, C09-0689, C09-0691, C09-0692, C09-0711, C09-0750, C09-0798, C09-0847, and C09-0866.  Thus, the Receiver seeks dismissal of the claims asserted against the Receiver in these sixteen cases pursuant to FED. R. CIV. P. 12(c).  *Id.* (Rule 12(c) is properly used to challenge a complaint after all pleadings are filed).

RECEIVER'S MOTION TO DISMISS - 12
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

their complaint and treating as false those allegations in the answer that contradict the plaintiffs' allegations." *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1301 n.2 (9th Cir. 1992); *see also Abagninin*, 545 F.3d at 737 (same). The Court, however, need not accept as true any conclusory allegations, legal conclusions, unwarranted deductions of fact, or unreasonable inferences alleged by plaintiffs. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). As discussed below, plaintiffs have not and cannot allege facts upon which to base a claim and, therefore, the Receiver is entitled to dismissal of plaintiffs' claims and for judgment on the pleadings, as a matter of law, pursuant to FED. R. CIV. P. 12(b)(6) and 12(c).

### B.    Plaintiffs' Claims Fail As A Matter Of Law Under 12 C.F.R. § 563.39

As discussed above, all of plaintiffs' claims in this consolidated lawsuit arise out of certain employment agreements between plaintiffs and the former WMB. Because WMB was a federally regulated thrift,[26] WMB, and by extension the employment agreements between WMB and its employees, were subject to OTS regulation.[27] One of the regulations WMB and its employment agreements were subject to was 12 C.F.R. § 563.39, and the Automatic Termination Provision contained in that regulation.[28] Section 563.39 has the same force and

---

[26] The OTS Order (properly subject to judicial notice) identifies WMB as a federally chartered savings association (*i.e.*, a thrift). Similarly, Washington Mutual, Inc.'s Form 10-K for the fiscal year ended December 31, 2006, filed with the Securities and Exchange Commission on March 1, 2007, reflects that WMB was a federally regulated thrift. *See* Keehnel Decl., Ex. P at 8 (WMB was "[o]ne of [Washington Mutual, Inc.'s] savings associations"). The Court may take judicial notice of this Securities and Exchange Commission filing without converting this Motion to a Rule 56 motion, and the Receiver requests the Court do so. *Dreiling v. American Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (on a motion to dismiss, court may properly take judicial notice of SEC filings without converting the motion to a Rule 56 motion); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (judicial notice of SEC filings on Rule 12 proper); *see also*, Footnote 2, above.

[27] Prior to 1989, thrifts were regulated by the Federal Home Loan Bank Board. In 1989, through the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (Pub. L. No. 101-73, 103 Stat. 183 (Aug. 9, 1989)) ("FIRREA"), Congress transferred the function of overseeing and regulating thrifts to the OTS, a function that the OTS continues to perform to this day.

[28] When FIRREA was enacted, and regulatory oversight of thrifts was transferred from the FHLBB to the OTS, FIRREA provided that all FHLBB regulations in force and effect on the day prior to enactment of FIRREA would remain in effect and enforceable by the OTS unless and until modified or cancelled by the OTS. *See* FIRREA, Title VI, Section 401(h); *accord Great Western Bank v. Office of Thrift Supervision*, 916 F.2d 1421, 1423 n.1 (9th

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1    effect as a federal statute. *See Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141,

2    153, 102 S.Ct. 3014 (1982) (regulations promulgated by the FHLBB, such as 12 C.F.R.

3    § 563.39, are enforced the same as federal statutes).[29]

4              1.    All Of Plaintiffs' Employment Contracts That Are At Issue In This
                     Lawsuit Terminated By Operation Of Law On September 25, 2008

5

6              Pursuant to the Automatic Termination Provision, all WMB employment agreements

7    terminated when the Director of the OTS determined WMB was in default and appointed a

8    receiver and, alternatively, when the Director determined WMB was in an "unsafe or unsound

9    condition." Section 563.39 provides:

10              (a)   General.   A savings association may enter into an employment
                contract with its officers and other employees only in accordance with the
11              requirements of this section. …

12              (b)   Required provisions.   Each employment contract shall provide that:
                …

13
                (4) *If the savings association is in default* (as defined in section 3(x)(1) of
14              the Federal Deposit Insurance Act), *all obligations under the contract
                shall terminate as of the date of default, but this paragraph (b)(4) shall
15              not affect any vested rights of the contracting parties*:  Provided, that this
                paragraph (b)(4) need not be included in an employment contract if prior
16              written approval is secured from the Director or his or her designee.

17              (5)  *All obligations under the contract shall be terminated*, except to the
                extent determined that continuation of the contract is necessary of [sic] the
18              continued operation of the association

19                  (i) By the Director or his or her designee, at the time the Federal
                Deposit Insurance Corporation or Resolution Trust Corporation enters into
20              an agreement to provide assistance to or on behalf of the association under
                the authority contained in 13(c) of the Federal Deposit Insurance Act; or

21
                    (ii) By the Director or his or her designee, at the time the Director or
22              his or her designee approves a supervisory merger to resolve problems
                related to operation of the association or *when the association is
23              determined by the Director to be in an unsafe or unsound condition*.

24    _____

25    Cir. 1990).  On November 30, 1989, the OTS took the affirmative step of endorsing the ongoing application of
      12 C.F.R. § 563.39 by formally adopting that section without change.  *See* 54 Fed. Reg. 49411 (Nov. 30, 1989).

26    [29]  *See also Del E. Webb McQueen Development Corp. v. Resolution Trust Corp.*, 69 F.3d 355, 358 (9th Cir. 1995)
      (recognizing the FLHBB's "plenary authority to make rules and adopt regulations governing receiverships and
      conservatorships of savings and loan associations").

RECEIVER'S MOTION TO DISMISS - 14                         DLA Piper LLP (US)
Master File No. C09-0504-RAJ                          701 Fifth Avenue, Suite 7000
                                                     Seattle, WA  98104 • Tel: 206.839.4800

1  *Any rights of the parties that have already vested, however, shall not be affected by such action.*

2  12 C.F.R. § 563.39 (emphasis added).   Thus, under Section 563.39, the moment the OTS

3  Director determines that an OTS-regulated thrift "is in default," which determination is

4  automatic at the time of appointment of FDIC as receiver (Section 563.39 ¶ (b)(4)) **or** the OTS

5  Director determines the thrift is "in an unsafe or unsound condition" (Section 563.39 ¶ (b)(5)),

6  all obligations under all employment contracts (with certain narrow exceptions not applicable

7  here) are **automatically terminated** by operation of law.  *See Aronson v. Resolution Trust*

8  *Corp.*, 38 F.3d 1110, 1113 (9th Cir. 1994) (Automatic Termination Provision of Section

9  563.39(b)(4) triggered when thrift is in "default"); *Romines v. Great-West Assur. Co.*, 73 F.3d

10  1457, 1462 (8th Cir. 1996) (OTS determination that thrift was in "unsafe or unsound" condition

11  triggered Automatic Termination Provision of Section 563.39(b)(5)).  The only employee rights

12  or benefits that are not affected by the Automatic Termination Provision of Section 563.39 are

13  those rights that are **already vested**.[30]  *Id.*

14        On September 25, 2008, the Director of the OTS determined that WMB went into

15  "default" and was "in an unsafe or unsound condition."  Specifically, on September 25, 2008,

16  the OTS Director issued Order No. 2008-36.  That Order states:  "The Director of the Office of

17  Thrift Supervision …, in cooperation with the Federal Deposit Insurance Corporation …

18  appoint[ed] the FDIC as receiver for [WMB]."  Keehnel Decl., Ex. A (OTS Order No. 2008-

19  36).  Under Section 563.39(b)(4), a thrift is in "default" for purposes of the Automatic

20  

21  [30]  At the October 8, 2009 Status Conference, *pro se* plaintiff Michael Day, who the Receiver understands is a California attorney, argued that Section 563.39 does not apply to plaintiffs' claims because the employment

22  agreements at issue here do not physically include the language that is contained in Section 563.39.  Presumably this argument is premised on the suggestion in Section 563.39 that the language of the Section must be included in

23  each thrift employment agreement.  *See* 12 C.F.R. § 563.39(b) ("Each employment contract shall provide that: … [the Automatic Termination Provision]").  Mr. Day's argument is clearly erroneous.  Courts have unanimously

24  held that Section 563.39 applies as a matter of law even to those thrift employment agreements that do not expressly include the language contained in the regulation.  *See, e.g.*, *Modzelewski v. Resolution Trust Corp.*, 14

25  F.3d 1374, 1380 (9th Cir. 1994) ("If an employment contract fails to contain [12 C.F.R. 563.39], it is read into the contract as an implied term"); *Barnes v. Resolution Trust Corp.*, 1992 WL 25203, *3 (D. Kan. 1992) (Section

26  563.39 found to be an implied term of plaintiff's employment contract); *Rush v. Federal Deposit Ins. Corp.*, 747 F. Supp. 575 (N.D. Cal. 1990) ("If not included, [12 C.F.R. § 563.39] is nonetheless read into an employment contract as an implied term").

RECEIVER'S MOTION TO DISMISS - 15
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA 98104 • Tel: 206.839.4800

1   Termination Provision the moment the OTS determines to appoint a receiver.   Specifically,

2   Section 563.39(b)(4) says "default" means "as defined in section 3(x)(1) [12 U.S.C.

3   § 1813(x)(1)] of the Federal Deposit Insurance Act [FDIA,]," which states:

4           The term 'default' means, with respect to an insured depository
            institution, any adjudication or other official determination by … the
5           appropriate Federal banking agency … pursuant to which a
            conservator, **receiver**, or other legal custodian is appointed for an
6           insured depository institution ….

7   12 U.S.C. § 1813(x)(1) (emphasis added).   Thus, the moment the OTS appointed FDIC as the

8   receiver for WMB (as it did on September 25, 2008 through Order No. 2008-36), WMB was in

9   "default" for purposes of Section 563.39(b)(4), and the Automatic Termination Provision was

10  triggered.[31]

11          Likewise, OTS Order No. 2008-36 specifically states that on September 25, 2008, the

12  Director of the OTS determined WMB to be "in an unsafe or unsound condition to transact

13  business."   Keehnel Decl., Ex. A (OTS Order No. 2008-36).   Section 563.39(b)(5) clearly

14  provides that the Automatic Termination Provision is triggered the moment a thrift is declared

15  by the Director of the OTS to be in an "unsafe or unsound condition."   12 C.F.R.

16  § 563.39(b)(5); *Crocker v. Resolution Trust Corp.*, 839 F.Supp. 1291, 1293 (N.D. Ill. 1993)

17  (Section 563.39(b)(5) triggered when OTS declared thrift "in an unsafe and unsound

18  condition").

19          The regulation is clear.   "If the savings association is in default…, all obligations under

20  the [employment] contract shall terminate as of the date of default…" 12 C.F.R. § 563.39(b)(4).

21  "All obligations under the [employment] contract shall be terminated … when the association

22  is determined by the Director [of the OTS] to be in an unsafe or unsound condition."   12 C.F.R.

23  § 563.39(b)(5).   Thus, on September 25, 2008, the moment the OTS issued Order No. 2008-

24

25
_____

26  [31]  Under Section 563.39(b)(4), FDIA section 3(x)(1), and OTS Order No. 2008-36, it cannot reasonably be
    disputed that WMB was in default for purposes of Section 563.39(b)(4) on September 25, 2008. *See Aronson*, 38
    F.3d at 1112 (Section 563.39(b)(4) triggered when thrift went into receivership).

RECEIVER'S MOTION TO DISMISS - 16                    DLA PIPER LLP (US)
Master File No. C09-0504-RAJ                         701 Fifth Avenue, Suite 7000
                                                     Seattle, WA  98104 • Tel: 206.839.4800

36,[32] all employment agreements between WMB and its employees (with certain possible exceptions not at issue here) were automatically terminated by operation of law. This includes all of the employment agreements underlying this consolidated lawsuit.

Because their employment agreements with WMB terminated on September 25, 2008, the only way any plaintiff in this lawsuit could even conceivably be entitled to payment of the claims they assert here is if their entitlement to payment from WMB **vested _prior to_** September 25, 2008 (*i.e.*, plaintiffs were entitled to payment under their employment agreements with WMB *before* WMB's failure on September 25, 2008). The regulation carves out from its Automatic Termination Provisions "rights that have already vested." 12 C.F.R. § 563.39(b). As we discuss below, the Ninth Circuit has squarely held that the types of "entitlements" claimed by plaintiffs here do not, as a matter of law, vest prior to the OTS's actions.

### 2. None Of Plaintiffs' Claims Vested Prior To Termination

In order for plaintiffs' "entitlement" to payment under the various employment agreements at issue in this consolidated lawsuit to vest, one or more of the following had to occur:

- A change-in-control event plus termination from employment. (This is the trigger in all Change-In-Control Agreements, all Severance Plan Agreements, and most Retention Agreements.)

- Elimination of the employee's position. (This is the trigger in a small number of Retention Agreements and in all Severance Plan Agreements.)

- In a few cases, only termination or only a change-in-control event. (This is the trigger in a very small number of Retention Agreements.)

---

[32] By asserting in this Motion that Section 563.39 was triggered on September 25, 2008, when WMB was seized by the OTS and placed into FDIC receivership, the Receiver does not concede that Section 563.39 was not triggered at an earlier time. Prior to its seizure, WMB was a failing institution, and it may be the case that Section 563.39 was triggered prior to September 25, 2008. But for purposes of this Rule 12 motion, and for the dismissal of plaintiffs' claims, it is sufficient that the Automatic Termination Provision of Section 563.39 was unquestionably triggered, with respect to WMB's employment agreements, including the agreements at issue in this consolidated lawsuit, on September 25, 2008.

RECEIVER'S MOTION TO DISMISS - 17
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA 98104 • Tel: 206.839.4800

1    None of these triggering events occurred for *any* of the plaintiffs ***prior to*** the automatic

2    termination of their employment agreements on September 25, 2008.[33]  Thus, none of the

3    plaintiffs are entitled to payment on the claims they are asserting in this consolidated lawsuit.

4    Obviously, the earliest arguable trigger for vesting is the change-of-control event itself

5    – the OTS's seizure of WMB.  Plaintiffs would like to argue that the same event that triggered

6    the extinguishing of the employment contracts under 12 C.F.R. § 563.39 also created payment

7    rights, and so plaintiffs should somehow be entitled to payment.[34]  The problem with such an

8    argument is that is directly contrary to both the plain language of 12 C.F.R. § 563.39 <u>and</u> is

9    directly contrary to an on-point, dispositive, binding decision by the Ninth Circuit Court of

10   Appeals.

11   <u>The Regulation is Clear</u>:  The regulation was written in apparent contemplation of the

12   precise argument plaintiffs would like to make, and the drafters wrote the regulation to

13   foreclose any argument that "the tie goes to the runner" (and that employees are the runners).

14   Specifically, the regulation, in its last line, states that only "rights of the parties that have

15   ***already vested*** … shall not be affected by such article [i.e., shall not be extinguished]."

16   12 C.F.R. § 563.39 (last sentence).  In short, where the triggering event for the entitlement to

17   payment is the <u>same</u> triggering event that causes the extinguishing of employment contracts,

18

19   _____

20   [33]  Specifically, plaintiffs do not, and cannot, allege that there was a change-in-control event, as defined by the
various agreements, *prior* to September 25, 2008.  Plaintiffs also do not, and cannot, allege that any of the

21   plaintiffs were terminated, or that their positions were eliminated, prior to September 25, 2008.  To the contrary,
plaintiffs candidly allege that they were not terminated prior to the OTS seizure of WMB on September 25, 2008,

22   but that their employment terminated thereafter.  *See, e.g.*, Collins Complaint, Case No. C09-0570, ¶ 13 ("Most of
the plaintiffs continued to work for WMB … until their termination by JP Morgan Chase after the transfer from

23   FDIC"); Bjorklund Complaint, Case No. C09-0691, ¶¶ 17 & 19 ("On September 26, 2008, Bjorklund was relieved
of his duties as Funding and Liquidity Manager …. Bjorklund was notified on November 5, 2008 that his

24   employment with JPM was eliminated as a result of JPM's control over WMB assets and former WMB employees
including Bjorklund, and that his termination date would be January 3, 2009"); Day Complaint, Case No. C09-

25   0684, ¶ 18 ("After WMB was placed into receivership, Plaintiff's employment with WMB ended.").

26   [34]  *See, e.g.*, Hutton Complaint, Case No. C09-0528, ¶ 15 ("When the FDIC seized control of WAMU and then
again when it sold WAMU to JP Morgan Chase, which [sic] constituted a change in control under the contracts.");
Zalutsky Complaint, Case No. C09-0866, ¶ 18 ("There was a change of control when the Office of Thrift
Supervision seized WAMU, Inc. [sic] and placed it into receivership with FDIC.").

1    the employees have no entitlement because their payment entitlements were not "already

2    vested" prior to the OTS seizure.

3        <u>The Ninth Circuit Law is Clear</u>:  In light of the clarity of 12 C.F.R. § 563.39 on the

4    issue, it is no surprise that a unanimous Ninth Circuit panel held that plaintiffs in the shoes of

5    the plaintiffs in our 18 cases, do not have an entitlement to payment.  The precise argument that

6    every plaintiff in our cases relies upon was squarely rejected by the Ninth Circuit in

7    *Modzelewski v. Resolution Trust Corp.*, 14 F.3d 1374 (9th Cir. 1994).  In *Modzelewski*, faced

8    with the exact argument raised by plaintiffs, the Ninth Circuit panel held:

> Modzelewski argues in the alternative that his rights vested at the moment
> the RTC took over.  Another provision of his contract states that, upon a
> change in control of management, Modzelewski is entitled to full benefits
> as if he had reached retirement age.  Thus, Modzelewski asserts that the
> RTC's takeover constituted such a change in control — vesting his rights
> even as they were voided.  By the terms of the regulation, however, all the
> rights terminated upon the RTC's appointment except for "[a]ny rights ...
> that have ***already vested**.*"  12 C.F.R. § 563.39(b)(5) (emphasis added [by
> the Court]). ***For Modzelewski's argument to work, his right would have
> had to vest <u>before</u> the RTC took over***.  As we hold above, they had not.

9
10
11
12
13
14

15    14 F.3d at 1378-79 (first emphasis in original; second emphasis added).  *Modzelewski*

16    conclusively confirms that plaintiffs' claims against the Receiver fail as a matter of law.  And

17    *Modzelewski* does not stand alone.  The Ninth Circuit endorsed its ruling in *Modzelewski* in

18    *Aronson v. Resolution Trust Corp.*, 38 F.3d 1110 (9th Cir. 1994):

19

> "[A] right is vested when the employee holding the right is entitled to
> claim ***immediate payment***."

20

21    38 F.3d at 1113 (quoting *Modzelewski*; emphasis in original).  The issue in *Aronson* was

22    whether plaintiff was entitled to payment of benefits under his employment agreement with a

23    failed institution that was taken over by the RTC.  The *Aronson* court focused on whether

24    plaintiff was entitled to "immediate payment" of the claimed amount before the RTC took over

25    his former employer.  Citing *Modzelewski*, the Court found that he was not, and dismissed

26    plaintiff's claims.  *Aronson*, 38 F.3d at 1113 (because plaintiff was not entitled to "immediate

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

payment" at the time the RTC took over his former employer, "as a matter of law, his rights to such payments did not vest within the meaning of 12 C.F.R. § 563.39(b), and the RTC properly denied Aronson's claim").  Under Section 563.39 and squarely on-point and dispositive Ninth Circuit case law, plaintiffs' claims fail as a matter of law.  Not a single plaintiff was entitled to benefits under any of the employment agreements underlying this lawsuit *before* WMB failed and was seized by the OTS on September 25, 2008.[35]

Courts in other circuits also consistently hold, as the Ninth Circuit unambiguously held in *Modzelewski* and *Aronson*, that contingent employee benefits do not "vest" within the meaning of the Automatic Termination Provision of Section 563.39 at the moment of thrift failure, and that for a right to be vested, the triggering event would have to have occurred *prior to* failure.

For example, in *Augienello v. Coast-to-Coast Fin. Corp.*, 2002 WL 1822926 (S.D.N.Y. 2002), *aff'd*, 64 Fed. Appx. 820 (2d Cir. 2003), the district court dismissed employee benefit receivership claims because: the employees had not been terminated without cause *prior to* takeover, and no "change of control" had occurred *prior to* takeover.  As a result, the court held, the employees asserting claims had no vested right to benefits.  *See also Crocker*, 839 F. Supp. at 1295-96 (Section 563.39 termination is not termination "without cause," and did not create a vested claim); *Barnes v. Resolution Trust Corp.*, 1992 WL 25203, *4 (D. Kan. 1992) (same); *Borodinsky v. Resolution Trust Corp.*, 1992 WL 5218, *5 (D.N.J. 1992) (Section 563.39 termination is not a "lay-off" creating vested right to severance pay); *Federal Sav. &*

---

[35] The few plaintiffs with Severance Plan Agreements that have payment triggers when the employee's position is "eliminated because of corporate restructuring, downsizing, or a reduction in force[,]" might similarly argue that WMB's failure/OTS seizure resulted in the elimination of their position, thus triggering payment obligations.  *See, e.g.*, Keehnel Decl., Ex. D ¶ 2.3 (Plaintiff Bjorklund's Severance Plan Agreement).  The courts have squarely rejected such arguments.  For example, in *Fleisher v. Federal Deposit Ins. Corp.*, 113 F.3d 168 (10th Cir. 1996), plaintiff claimed he was entitled to severance benefits because his former thrift employer's failure constituted "a reduction in work force[,]" which plaintiff argued triggered his right to benefits under his severance agreement.  The Tenth Circuit rejected the argument, and held that plaintiff's employment was terminated by operation of law under Section 563.39, rather than through a work force reduction, and that his severance pay claim was properly disallowed.  *Id.* at 172; *see also Romines*, 73 F.3d at 1464 (employee had no "unconditional" or "immediate" right to severance benefits at the time of thrift failure, so plaintiff's claim is properly denied under Section 563.39).

RECEIVER'S MOTION TO DISMISS - 20
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

*Loan Ins. Corp. v. Quinn*, 711 F. Supp. 366, 378-79 (N.D. Ohio 1989), vacated on other grounds, 922 F.2d 1251 (6th Cir. 1991) (since no "triggering event" occurred prior to Section 563.39 termination, no benefits were vested); *accord Wilde v. First Fed. Sav. & Loan Ass'n*, 134 Ill. App.3d 722, 730-31 (Ill. Ct. App. 1985) (employee's contingent right to severance if terminated without cause did not "vest" when his contract was terminated under Section 563.39).

Because the Ninth Circuit's ruling in *Modzelewski* is squarely on point (and courts around the country are in accord), plaintiffs' claims in this consolidated lawsuit are barred by 12 C.F.R. § 563.39. Under that provision, plaintiffs' employment agreements with the former WMB terminated as a matter of law on September 25, 2008, when WMB was seized by the OTS, must be dismissed. The *only way* plaintiffs would be entitled to payment under any of their employment agreements with WMB is if the right to payment existed (*i.e.*, vested) ***prior to*** September 25, 2008. None of the plaintiffs allege that their rights vested ***prior to*** September 25, 2008, nor can they, given the holding in *Modzelewski*. Plaintiffs' claims all fail as a matter of law, and should be dismissed with prejudice.

### C.    All Of Plaintiffs' Alleged Causes Of Action Should Be Dismissed On This Rule 12 Motion

Each and every cause of action asserted by plaintiffs should be dismissed on this Rule 12 Motion.

***Breach of Contract Claims***. All plaintiffs assert a breach of contract claim against the Receiver, alleging the Receiver breached each plaintiff's respective employment agreement(s) with WMB by not paying the employment benefits sought under those agreements. Plaintiffs' contract breach claims fail for the reasons discussed in Part III.B., above — *i.e.*, as a matter of law, none of the plaintiffs here are contractually entitled to the employment benefits they seek through this lawsuit, because none of the plaintiffs' claimed entitlements vested prior to the agreements being automatically extinguished by the OTC's actions.

***Wrongful Withholding of Wages Claims***.    Some plaintiffs assert a wrongful withholding of wages cause of action, claiming "[t]he monies due and owing from the change of control agreements constitute wages already earned by the plaintiffs."    Koro Complaint, Case No. C09-0553, ¶ 20.    Because the wage-withholding claims are based on the same alleged entitlement to employment benefits as the breach of contract claims, they fail for the same reason — *i.e.*, as a matter of law, none of the plaintiffs here are entitled to employment benefits under the extinguished agreements.    Because plaintiffs are not entitled to the "wages" they seek, there can be no "wrongful withholding" of such "wages."    *See Champagne v. Thurston Cty.*, 134 Wn. App. 515, 519, 141 P.3d 72 (2006) (no claim for withholding of wages exists where the claimant is not entitled to the "wages" he seeks).

***Conversion Claim***.    One plaintiff alleges conversion, claiming the Receiver "withheld [plaintiff's] property ..., by using the monies owed to [plaintiff] for some other use...."    Freilinger Complaint, Case No. C09-0692, ¶ 44.    But because, as a matter of law, the plaintiff had no right to the monies he alleges were "converted," plaintiff's conversion claim fails as a matter of law.    *See Kruger v. Horton*, 106 Wn.2d 738, 743, 725 P.2d 417 (1986) ("The plaintiff in a conversion action must prove a right to possess the property converted.").

***Contract Clause Claim***.    One plaintiff alleges the Receiver's refusal to pay under the employment contracts "violat[es] the contracts clause of the United States Constitution."    Zalutsky Complaint, Case No. C09-0866, ¶ 23.    But for there to be a violation of the Contract Clause, plaintiff must have had a valid contract right that was violated.    *See Robertson v. Kulongoski*, 359 F. Supp.2d 1094, 1099 (D. Or. 2004) ("If there is no contract [claim], then the Contract Clause does not protect those benefits.")    Plaintiff did not.    The Automatic Termination Provision of Section 563.39 was an implied term in plaintiff's employment agreement.[36]    That implied term provided that the moment the OTS seized WMB, plaintiff's employment agreement automatically terminated and ***only vested rights*** survived termination of

---

[36]    *See Modzelewski v. Resolution Trust Corp.*, 14 F.3d 1374, 1380 (9th Cir. 1994) ("If an employment contract fails to contain [12 C.F.R. 563.39], it is read into the contract as an implied term").

RECEIVER'S MOTION TO DISMISS - 22
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1  the agreement.  Because no rights vested prior to termination, the Receiver did not infringe on

2  any of plaintiff's contract rights and, therefore, did not engage in an unlawful taking of

3  property.  What plaintiff is implicitly arguing here is that Congress and the OTS cannot issue

4  legislation/regulations that would in any way affect any contract between parties.  The courts

5  have soundly rejected that argument.[37]

6      ***Takings Claims***.  Several plaintiffs allege the Receiver's refusal to pay under the

7  employment agreements constitutes "a taking of property without due process of law" in

8  violation of the United States Constitution.  *See, e.g.,* Collins Amended Complaint, Case

9  No. C09-0570, ¶ 25.  For the same reason the Contract Clause argument fails, plaintiffs'

10  unlawful taking of property claim fails.  Again, for there to be an unlawful taking of property,

11  the party asserting the claim must first establish he or she had a right to that property.  *National*

12  *R.R. Passenger Corp. v. Atchison, Topeka Co.*, 470 U.S. 451, 465, 105 S.Ct. 1441 (1985).

13  Again, by the terms of plaintiffs' own employment agreements, they did not have a right to the

14  employment benefits they seek to recover through this consolidated lawsuit.  The implied term

15  Section 563.39 resulted in the termination of the employment agreements before any property

16  rights vested under the agreements and so there was no taking of property.  Requiring

17  Section 563.39 to be an implied term in plaintiffs' employment agreements was something the

18  regulators had the authority to require.  *Id.* at 476-77 ("Congress remained free to adjust the

19  burdens and benefits of economic life, as long as it did so in a manner that was neither arbitrary

20  nor irrational"); *see also Federal Deposit Ins. Corp. v. Shain, Schaffer & Rafanello*, 944 F.2nd

21  129, 136 (3d Cir. 1991) (FIRREA and regulations thereunder do not violate the Takings

22  Clause).

23      ***Estoppel Claims Based on Washington Mutual Bank's Employment Contracts***.

24  Plaintiffs in three lawsuits assert estoppel as a cause of action based on "Washington

25

26  [37]  Statutes such as FIRREA, and regulations under the authority of such statutes, do not violate the Contract Clause of the United States Constitution.  *See SCFC ILC Inc. v. Visa U.S.A. Inc.*, 763 F.Supp. 1094, 1097 n.7 (D. Utah 1991), *vacated on other grounds by* 936 F.2d 1096 (10th Cir. 1991).

RECEIVER'S MOTION TO DISMISS - 23
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1 Mutual['s] representations to Plaintiffs that they would receive a change of control bonus bonus

2 [sic] in the event that their employment was terminated."  Du Bey Complaint, Case No. C09-

3 0711, ¶ 30.  In other words, these plaintiffs allege the Receiver is estopped from denying their

4 employment benefits claim because WMB allegedly promised, through their employment

5 agreements, payment on such claims.[38]  Again, plaintiffs' employment agreements terminated

6 by operation of law before any amounts were due under those agreements.[39]  So, by operation

7 of law, no "representations" were made that were contradicted, and this "estoppel" claim fails

8 as a matter of law.[40]

9      ***Estoppel Claims Based on the Receiver's Basis for Rejection***.  In three lawsuits,

10 plaintiffs assert estoppel based on the theory that the Receiver allegedly provided inconsistent

11 reasons for denying plaintiffs' claims.  First, that is simply false.  The Receiver has been

12 consistent in its position that plaintiffs' claims fail as a matter of law.[41]  But that is irrelevant

13 for purposes of this Motion.  The fact is, the moment WMB failed, plaintiffs' employment

14 agreements terminated by operation of law, and any subsequent explanation by the Receiver for

15 why plaintiffs' claims fail did not nullify the termination of those agreements.

16      ***Claims That Repudiation Did Not Occur Within a "Reasonable" Time***.  Two

17 complaints allege the Receiver did not repudiate plaintiffs' employment contracts within a

18 "reasonable" time.  These allegations miss the point. The Automatic Termination Provision of

19

20 [38]  As the Court can see, this "cause of action" is really nothing more than a poorly designated breach of contract

21 claim.  For the sake of argument, however, the Receiver will treat it as it is designated – *i.e.*, as an "estoppel" claim.

22 [39]  As explained above (*see* note 30), Section 563.39 applies as a matter of law whether or not the employment

23 agreements expressly include its language.  *See Modzelewski*, 14 F.3d at 1380 ("If an employment contract fails to contain [12 C.F.R. 563.39], it is read into the contract as an implied term").

24 [40]  Notably, plaintiffs do not and cannot allege the Receiver made any representations to plaintiffs regarding

25 payment.  Moreover, even if plaintiffs made such claims, they would fail.  By the terms of plaintiffs' employment agreements, only the terms of those agreements are enforceable.  *See, e.g.*, Keehnel Decl., Ex. C (Plaintiff Freilinger's Change-In-Control Agreement § 13(a) ("This Agreement is the entire agreement between the parties

26 and may not be modified or abrogated orally or by course of dealing . . . .")).

[41]  *See, e.g.*, Freilinger Complaint, Case No. C09-0692, ¶18, Ex. B (Notice of Disallowance of Claim (plaintiff's claim fails because "Washington Mutual Bank's failure was an act of law")).

RECEIVER'S MOTION TO DISMISS - 24
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA 98104 • Tel: 206.839.4800

1  Section 563.39 terminated all of plaintiffs' employment agreements with WMB immediately,

2  and by operation of law, the moment OTS Order No. 2008-36 was issued on September 25,

3  2008.  The employment agreements at issue in this consolidated lawsuit did not need to be

4  repudiated for plaintiffs' claims to fail as a matter of law.

5      All of plaintiffs' alleged causes of action fail as a matter of law and should be dismissed

6  on this Rule 12 motion.

7      **D.    <u>Section 563.39's History Evidences Congress' And Regulatory Authorities'
       Clear Intention That Claims Such As Plaintiffs' Here Should Be Dismissed</u>**

8

9      Section 563.39's thirty-five year history confirms the appropriateness of dismissing

10  plaintiffs' claims in this consolidated lawsuit.  Barring claims such as the claims plaintiffs

11  assert through this consolidated lawsuit is precisely what Section 563.39 was (in 1974) and is

12  (today) designed to do.  In its thirty-five year history, the regulation has only grown in the

13  scope of its application.

14      The OTS's predecessor, the FHLBB, promulgated Section 563.39 in 1974 to protect

15  against potential abuses, to enhance regulatory flexibility, and to protect deposit insurance

16  funds in thrift failures.  *See* 47 Fed. Reg. 17471 (Apr. 23, 1982); *accord* 46 Fed. Reg. 9917

17  (Jan. 30, 1981) (Section 563.39 prevents "obstacles" created by employee benefit claims from

18  undermining regulatory ability to implement failed thrift assistance transactions).  Originally,

19  the regulation applied primarily to federally-chartered thrifts, and to employment contracts only

20  between those thrifts and their officers.[42]  The FHLBB soon determined that its original version

21  of Section 563.39 was too limited in scope.  In 1982, the FHLBB extended the Automatic

22  Termination Provision to cover *all* thrifts (federally- and state-chartered), and *all* employee

23  agreements entered into by those thrifts (not just agreements with officers).  *See* 47 Fed. Reg.

24  17471 (Apr. 23, 1982).

25

26  ---

[42]  *See* 39 Fed. Reg. 28609 (Aug. 9, 1974) (original provision only required federally-regulated thrift's to include Automatic Termination Provision in officer's employment agreements).  With respect to state-chartered thrifts, the original version of Section 563.39 did bar unsafe and unsound employee agreements with those thrifts, but did not go beyond that narrow framework.  *See* 39 Fed. Reg. 28610 (Aug. 9, 1974).

RECEIVER'S MOTION TO DISMISS - 25
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1    In 1989, with the enactment of FIRREA, regulatory oversight of thrifts and the

2    enforcement of Section 563.39 was transferred from the FHLBB to the OTS.[43]  Promptly upon

3    taking over regulation of thrifts, the OTS endorsed the ongoing application of Section 563.39

4    by formally adopting that section without change.  *See* 54 Fed. Reg. 49411 (Nov. 30, 1989).

5    The regulation remains today as it was adopted by the OTS, and it has been consistently

6    enforced in that form to this day.

7    In the 35 years since Section 563.39 was promulgated, Congress has never indicated

8    any displeasure with its Automatic Termination Provision.  If anything, Congress' conduct

9    suggests the regulation does not go far enough.  For example, in connection with the savings

10   and loan ("S&L") crisis of the late 1980's and early 1990's, members of Congress repeatedly

11   voiced their outrage over receivership employee benefit claims that "rewarded" thrift

12   employees who Congress believed were largely responsible for the S&L crisis.  In response,

13   Congress provided the FDIC and other regulatory agencies with even greater authority over

14   employment agreements than that already provided by 12 C.F.R. § 563.39 and similar

15   regulations.

16   As an example, one of the additional powers provided by Congress to the FDIC in 1990

17   was the "Golden Parachute" statute, which gave the FDIC the "[a]uthority to regulate or

18   prohibit certain forms of benefits" that thrifts may provide to their employees and interested

19   parties.  12 U.S.C. § 1828(k).  Senator Schumer advocated the need for the Golden Parachute

20   statute, and explained its purpose as follows:

> New subsection (k) is intended to provide the [FDIC] with the necessary
> authority to prevent officers and directors of insured institutions or holding
> companies from voting themselves generous bonuses at the expense of the
> institution or company, and ultimately, perhaps, the Federal Deposit
> Insurance Corporation, as well as to prevent directors and officers from
> escaping personal liability for violations of law, by prohibiting institutions
> from paying their legal fees and fines in such actions.

---

[43]  *See* FIRREA, Title III, Section 301, and Title VI, Sections 401(f), (g) & (h); *accord Great Western Bank v. Office of Thrift Supervision*, 916 F.2d 1421, 1423 n.1 (9th Cir. 1990).

RECEIVER'S MOTION TO DISMISS - 26
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

136 Cong. Rec. E3684-02, E3687, 1990 WL 206971 (Cong. Rec.) (October 27, 1990).  Senator

Schumer summarized the need for the provision with this poignant, rhetorical question:

> How many of us have been outraged by the fact that as taxpayers are
> bailing out the savings and loans, the officers and directors are making
> hundreds of thousands of dollars in these golden parachutes as institutions
> crash down.

136 Cong. Rec. H13288-02, H13296, 1990 WL 168500 (Cong. Rec.) (October 27, 1990).  The

logic behind Senator Schumer's obvious indignation applies with equal force against the claims

plaintiffs are asserting in this consolidated lawsuit.  As United States taxpayers and the millions

of shareholders of the now nearly-valueless Washington Mutual, Inc. (whose largest asset was

WMB) had foisted on them the loss of the failed WMB (which many argue failed due to poor

management), plaintiffs, who are high-level management employees of the former WMB, are

seeking substantial cash payouts from the receivership assets of the failed thrift.  Surely if

Congress wanted claimants such as plaintiffs in this lawsuit to receive the payments they seek,

Congress would have repealed Section 563.39 (or narrowed it in scope) and thrift regulators

would not have been required to apply it with diligent force for thirty-five years.  But that is not

what happened.  To the contrary, Congress continues to enact statutes, such as the Golden

Parachute statute, that empower regulators to promulgate further regulations to curb the type of

windfall payouts that plaintiffs seek through this consolidated lawsuit.[44]  Congress and federal

regulators have uniformly and consistently worked hard to ensure such payouts are not made.[45]

This Court should reward that hard work, and defer to clear Congressional intent, by granting

---

[44]   The Golden Parachute statute permits the FDIC to promulgate regulations that restrict or prohibit employee
benefits that are triggered by or during the deteriorating financial condition of a thrift.  *See* 12 U.S.C. §1828(k)(1).
Pursuant to this authority, the FDIC promulgated 12 C.F.R. § 359 to aid in the enforcement of the Golden
Parachute statute.

[45]   Commenting on the propriety of the Golden Parachute statute, Congressman LaFalce said it well:

> We must … place a premium on reducing taxpayer costs.  If there is value to be realized
> in failed or failing institutions, that value should act to defray Government, and therefore,
> taxpayer obligations.

136 Cong. Rec. H4385-02, H4388, 1990 WL 92250 (Cong. Rec.) (June 28, 1990).

RECEIVER'S MOTION TO DISMISS - 27
Master File No. C09-0504-RAJ

1  this Motion and finally ending plaintiffs' pursuit of the unearned windfall payouts they seek

2  through this consolidated lawsuit.

3  **IV.    CONCLUSION**

4       Through this consolidated lawsuit, plaintiffs seek employment benefits to which they

5  are not entitled.  Plaintiffs all had employment agreements with the now failed WMB.  Those

6  agreements provided for contingent benefits under certain defined circumstances.    On

7  September 25, 2008, WMB failed, was seized by the OTS, and was placed into FDIC

8  receivership.   When that happened, all of plaintiffs' employment agreements with WMB

9  terminated by operation of law pursuant to 12 C.F.R. § 563.39.  None of the plaintiffs had any

10 vested rights under those agreements, and so none of the plaintiffs are entitled to payment from

11 the Receiver for employee benefits out of the receivership assets of the former WMB.

12 Plaintiffs' claims in this consolidated lawsuit fail as a matter of law and should be dismissed

13 with prejudice.

14       Respectfully submitted this 22nd day of October, 2009.

15

16

17                            *s/ Stellman Keehnel*
                            Stellman Keehnel, WSBA No. 9309
18                          Russell B. Wuehler, WSBA No. 37941
                            Catherine R. Borden, WSBA No. 39666
19                          DLA PIPER LLP (US)
                            701 Fifth Avenue, Suite 7000
20                          Seattle, WA  98104-7044
                            Telephone:  206.839.4800
21                          Fax:  206.839.4801
                            E-mail:  stellman.keehnel@dlapiper.com
22                                  russell.wuehler@dlapiper.com
                                    catherine.borden@dlapiper.com
23
                            *Counsel for Federal Deposit Insurance*
24                          *Corporation, as Receiver for Washington Mutual*
                            *Bank*
25

26

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1

**CERTIFICATE OF SERVICE**

2   I hereby certify that on October 22, 2009, I caused to be electronically filed the

3   foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

4   such filing to the attorneys of record for the parties.

5   In addition, I caused the foregoing to be served by U.S. Mail and e-mail on *pro se*

6   plaintiff Michael F. Day at the following addresses:

7

8   Michael F. Day
    60 Monterey Drive
    Tiburon, CA 94920
9   *Michael.forest.day@gmail.com*

10

11  Dated this 22nd day of October, 2009.

12

13  */s/ Russ Wuehler*
    _____
    Russell B. Wuehler
14

15  WEST\21817876.3

16

17

18

19

20

21

22

23

24

25

26

RECEIVER'S MOTION TO DISMISS - 29
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA 98104 • Tel: 206.839.4800