The Honorable Richard A. Jones

1

2

3

4

5

6

7        UNITED STATES DISTRICT COURT

8        WESTERN DISTRICT OF WASHINGTON

9        AT SEATTLE

10

*In re Former Employees of Washington*        Master File No. C09-0504 RAJ
11  *Mutual Bank v. FDIC as Receiver for*
*Washington Mutual Bank, et al.*        **MOTION PURSUANT TO FRCP 12(b)(6)**
12        **AND FOR JUDGMENT ON THE**
        **PLEADINGS PURSUANT TO FRCP 12(c)**
13        **TO DISMISS ALL CLAIMS AGAINST**
        **DEFENDANT FEDERAL DEPOSIT**
14        **INSURANCE CORPORATION, AS**
        **RECEIVER FOR WASHINGTON**
15        **MUTUAL BANK**

16        Oral Argument:   January 21, 2011, at
                             2:00 p.m.
17

18

19

20

21

22

23

24

25

26

RECEIVER'S MOTION TO DISMISS                    DLA Piper LLP (US)
Master File No. C09-0504-RAJ                 701 Fifth Avenue, Suite 7000
                                          Seattle, WA 98104 • Tel: 206.839.4800

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# TABLE OF CONTENTS

**Page**

I.  PROCEDURAL RECAP, INTRODUCTION AND SUMMARY OF ARGUMENT........ 1

II. FACTUAL BACKGROUND ......................................................................................... 6

    A. The Change-In-Control Employment Contracts ..................................................... 8

        1. The Change-In-Control Agreements ............................................................. 9

        2. The Severance Plan Agreements ................................................................. 10

        3. The Retention Agreements .......................................................................... 12

        4. All Of Plaintiffs' Change-In-Control Employment Contracts Are
           Materially The Same ................................................................................... 13

        5. Causes Of Action Asserted By Plaintiffs Against The Receiver Based
           Upon The Change-In-Control Employment Contracts ............................... 13

    B. The SERAP ........................................................................................................... 14

III. AUTHORITY AND ARGUMENT .......................................................................... 15

    A. Applicable Legal Standards ................................................................................. 15

    B. All Of Plaintiffs' Change-In-Control Employment Contract Claims Fail As A
        Matter Of Law Under 12 C.F.R. § 563.39 ............................................................ 16

        1. All Of Plaintiffs' Change-In-Control Employment Contracts That
           Are At Issue In This Consolidated Lawsuit Terminated By Operation
           Of Law On September 25, 2008 .................................................................. 17

        2. None Of Plaintiffs' Claims Vested Prior To Termination .......................... 21

        3. All Of Plaintiffs' Alleged Causes Of Action Arising Out Of The
           Change-In-Control Employment Contracts Should Be Dismissed With
           Prejudice On This Rule 12 Motion ............................................................. 29

    C. The SERAP Claims Fail As A Matter Of Law ...................................................... 33

IV. CONCLUSION ........................................................................................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aronson v. Resolution Trust Corp.*,
38 F.3d 1110 (9th Cir. 1994)........................................................................*passim*

*Augienello v. Coast-To-Coast Fin. Corp.*,
Case No. C-11608 (RWS), 2002 WL 1822926 (S.D.N.Y. 2002) ...................... 24

*Balistreri v. Pacifica Police Dep't*,
901 F.2d 696 (9th Cir. 1988)............................................................................. 15

*Barnes v. Resolution Trust Corp.*,
Case No. C91-2011-V, 1992 WL 25203 (D. Kan. 1992) ............................ 19, 25

*Bell Atlantic Corp. v. Towmbly*,
550 U.S. 544, 127 S.Ct. 1995 (2007) ................................................................ 16

*Borodinsky v. Resolution Trust Corp.*,
Case No. C09-2606 (CSF), 1992 WL 5218 (D.N.J. 1992) ................................ 25

*Calhoun v. Hook*,
Case No. 08-5697-RJB-KLS, 2009 WL 4928048 (W.D. Wash. Dec. 14, 2009)................ 36

*Coto Settlement v. Eisenberg*,
593 F.3d 1031 (9th Cir. 2010)................................................... 26, 33, 34

*Crocker v. Resolution Trust Corp.*,
839 F. Supp. 1291 (N.D. Ill. 1993) ...................................................... 20, 25

*Del E. Webb McQueen Dev. Corp. v. Resolution Trust Corp.*,
69 F.3d 355 (9th Cir. 1995)............................................................................... 17

*Dreiling v. American Express Co.*,
458 F.3d 942 (9th Cir. 2006).................................................... 17, 27, 34

*Dworkin v. Hustler Magazine Inc.*,
867 F.2d 1188 (9th Cir. 1989)........................................................................... 16

*Federal Deposit Ins. Corp. v. Shain, Schaffer & Rafanello*,
944 F.2d 129 (3d Cir. 1991)............................................................................... 31

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

**Page(s)**

*Federal Sav. & Loan Ins. Corp. v. Quinn*,
    711 F. Supp. 366 (N.D. Ohio 1989) ................................................................ 25

*Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*,
    458 U.S. 141, 102 S. Ct. 3014 (1982) ............................................................. 17

*Fleisher v. Federal Deposit Ins. Corp.*,
    113 F.3d 168 (10th Cir. 1996) ........................................................................ 24

*Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*,
    887 F.2d 228 (9th Cir. 1989) ......................................................................... 15

*Great Western Bank v. Office of Thrift Supervision*,
    916 F.2d 1421 (9th Cir. 1990) ....................................................................... 17

*Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*,
    896 F.2d 1542 (9th Cir. 1990) ....................................................................... 16

*Intri-Plex Technologies, Inc. v. Crest Group, Inc.*,
    499 F.3d 1048 (9th Cir. 2007) .......................................................................... 7

*Kruger v. Horton*,
    106 Wn.2d 738, 725 P.2d 417 (1986) ............................................................ 30

*Lapidus v. Hecht*,
    232 F.3d 679 (9th Cir. 2000) ............................................................................ 7

*Lease Crutcher Lewis WA, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
    Case No. C08-1862, 2009 WL 3444762 (W.D. Wash. Oct. 20, 2009) .............. 33

*Lehrer v. Dep't of Soc. & Health Servs.*,
    101 Wn. App. 509, 5 P.3d 722 (2000) ............................................................ 33

*Liebb v. Daly*,
    Case Nos. C04-0950 & C044213, 2008 WL 902110 (N.D. Cal. Mar. 31, 2008) .............. 16

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ....................................................................... 16

*Lorrilard v. Pons*,
    434 U.S. 575 (1978) ...................................................................................... 23

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1

Page(s)

2

*Mack v. South Bay Beer Distrib.*,
  798 F.2d 1279 (9th Cir. 1986)........................................................................ 6

3

4

*McGuire v. Dendreon Corp.*,
  Case No. C07-0800MJP 2008 WL 1791381 (W.D. Wash. Apr. 18, 2008)...................... 34

5

6

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008)...................................................................... 17

7

8

*MGIC Indem. Corp. v. Weisman*,
  803 F.2d 500 (9th Cir. 1986)................................................................... 6, 36

9

10

*Modzelewski v. Resolution Trust Corp.*,
  14 F.3d 1374 (9th Cir. 1994).................................................................*passim*

11

*National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*,
  470 U.S. 451, 105 S.Ct. 1441 (1985).............................................................. 31

12

13

*Nugget Hydroelectric v. Pacific Gas & Elec.*,
  981 F.2d 429 (9th Cir. 1992)........................................................................ 6

14

15

*Pope v. Univ. of Washington*,
  121 Wn.2d 479, 852 P. 2d 1055 (1994) ............................................................ 29

16

17

*Robertson v. Kulongoski*,
  359 F. Supp.2d 1094 (D. Or. 2004)................................................................. 30

18

*Romines v. Great-West Assur. Co.*,
  73 F.3d 1457 (8th Cir. 1996)................................................................. 18, 24

19

20

*Rush v. Federal Deposit Ins. Corp.*,
  747 F. Supp. 575 (N.D. Cal. 1990) ............................................................. 6, 19

21

22

*SCFC ILC Inc. v. Visa U.S.A. Inc.*,
  763 F. Supp. 1094 (D. Utah 1991) ................................................................ 30

23

24

*Sgro v. Danone Waters of North America, Inc.*,
  532 F.3d 940 (9th Cir. 2008)........................................................................ 7

25

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001)........................................................... 16, 27, 35

26

*Stevenson v. United Subcontractors, Inc.*,
  Case No. C08-5558, 2008 WL 5114270 (W.D. Wash. Dec. 2, 2008) .............................. 30

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA 98104 • Tel: 206.839.4800

**Page(s)**

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007)..............................................................................34

*Thompson v. Illinois Dep't. of Prof'l. Regulation*,
    300 F. 3d 750 (7th Cir. 2002)...............................................................22, 27, 35

*Wilde v. First Fed. Sav. & Loan Ass'n*,
    134 Ill. App.3d 722 (Ill. Ct. App. 1985) ..............................................25, 27, 32

*Zango, Inc. v. PC Tools Pty LTD.*,
    494 F. Supp.2d 1189 (W.D. Wash. 2007)...........................................................33

**STATUTES**

12 U.S.C. § 1813(x)(1)........................................................................................19

FIRREA, Pub. L. No. 101-73, 103 Stat. 183 (Aug. 9, 1989)..................................17

**OTHER AUTHORITIES**

12 C.F.R. § 563.39(b)..................................................................................*passim*

59 F.R. 53568-02 (Oct. 25, 1994) .........................................................................23

60 F.R. 35286-01 (July 6, 1995) ...........................................................................23

60 F.R. 66714-01 (Dec. 26, 1995) .........................................................................23

61 F.R. 575-04 (Jan. 8, 1996).................................................................................23

61 F.R. 6100-01 (Feb. 16, 1996)............................................................................23

61 F.R. 45684-01 (Aug. 29, 1996)..........................................................................23

62 F.R. 6449-02 (Feb. 12, 1997)............................................................................23

63 F.R. 51272-01 (Sept. 25, 1998).........................................................................23

64 F.R. 2805-01 (Jan. 19, 1999).............................................................................23

66 F.R. 65817-01 (Dec. 21, 2001) .........................................................................23

68 F.R. 25090-01 (May 9, 2003)............................................................................23

                                                                                    **Page(s)**

75 F.R. 44656-01 (July 28, 2010) ......................................................................... 23

54 Fed. Reg. 49411 (Nov. 30, 1989) .................................................................... 17

Defendant Federal Deposit Insurance Corporation, as Receiver for Washington Mutual Bank (the "Receiver"), respectfully submits this motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) and for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c), to dismiss all claims against the Receiver (the "Motion").[1]   This Motion seeks an order from the Court dismissing, with prejudice, all of plaintiffs' claims asserted against the Receiver in this consolidated lawsuit.

## I.   PROCEDURAL RECAP, INTRODUCTION, AND SUMMARY OF ARGUMENT

For well over a year, this Court has been more accommodating than required by Ninth Circuit standards in permitting plaintiffs to amend, supplement, and refashion their claims.  No one could possibly criticize this Court for not having given plaintiffs a second chance (and a third chance, and a fourth chance…).  But now the time is up for further amendments to the complaints.  Now is the time to scrutinize plaintiffs' claims, in light of the binding, on-point Ninth-Circuit authority (*Modzelewski v. Resolution Trust Corp.*, 14 F.3d 1374 (9th Cir. 1994), enforcing 12 C.F.R. 563.39), to determine whether plaintiffs have stated a claim on which relief can be granted.  They haven't.  This Court should now dismiss with prejudice all of plaintiffs' claims.

As the Court is aware, with one minor exception, the grounds for dismissal of all of plaintiffs' claims against the Receiver were previously fully briefed and argued to the Court.  On October 22, 2009, exactly one year ago to the day this Motion is being filed, the Receiver filed a motion to dismiss plaintiffs' claims in this consolidated lawsuit, which plaintiffs alleged arose out of plaintiffs' various change-in-control employment contracts with the failed Washington Mutual Bank, Henderson, Nevada ("WMB").  On December 1, 2009, plaintiffs filed their opposition to that motion.  On December 16, 2009, the Receiver filed its reply in

---

[1]  Four of the pending consolidated complaints, including the recently filed amended complaint, have not yet been answered by the Receiver, thus making a Rule 12(b)(6) motion proper.  The Receiver has answered the other 16 complaints, thus making a Rule 12(c) motion proper.

RECEIVER'S MOTION TO DISMISS - 1
Master File No. C09-0504-RAJ

1  support of dismissal.  The Court heard extensive oral argument on that motion on January 22,
2  2010.

3  Following the January 2010 hearing on the Receiver's dismissal motion, plaintiffs filed
4  numerous ancillary papers, culminating in their May 21, 2010 filing of another motion for leave
5  to amend their complaints.  That amendment motion sought to recast the claims previously
6  alleged by plaintiffs and sought to add new claims against the Receiver (by certain plaintiffs)
7  under a completely different employment benefit plan – the Washington Mutual, **Inc.**
8  Supplemental Executive Retirement Accumulation Plan (the "SERAP").  On September 28,
9  2010, the Court denied in part and generously granted in part the motion to amend.
10  Specifically, the Court denied plaintiffs' request to recast the claims previously alleged (and to
11  assert "new" causes of action based on previously alleged facts), but granted plaintiffs' motion
12  to allow plaintiffs to amend their complaints to add the SERAP claims.[2]  On October 1, 2010,
13  the SERAP plaintiffs filed their amended complaint to add their purported SERAP claims.  In
14  total, 35 plaintiffs allege SERAP claims (the "SERAP plaintiffs").  Other than the addition of
15  the SERAP claims, the allegations in this consolidated lawsuit are materially the same as they
16  were when the Receiver previously sought dismissal of plaintiffs' claims.

17  The Receiver now seeks dismissal of all of plaintiffs' claims – the change-in-control
18  employment contract claims **and** the newly alleged SERAP claims.  The change-in-control
19  claims must be dismissed under the governing Ninth Circuit holding in *Modzelewski*.  The
20  SERAP claims must be dismissed because the governing SERAP plan document states plainly
21  that SERAP "benefits are payable **solely** from the general assets of [Washington Mutual, Inc.]."
22  Washington Mutual, Inc., the bankrupt parent company of WMB, is not a party to this lawsuit,
23  nor does the Receiver stand in the shoes of Washington Mutual, Inc.  Plaintiffs may have a

---

25  [2]  The Court acknowledged the Receiver's position that an amendment adding SERAP claims was futile, but ruled
that, in light of the procedural posture of that motion – a motion to amend, rather than a motion to dismiss – the
26  Court was not in a position to reject plaintiffs' effort to pursue their purported SERAP claims.  *See* Dkt. No. 101,
September 27, 2010 Order, at 3:1-3.  The Court added that it "will, of course, consider any challenge to the
[SERAP] claim via a motion to dismiss."  *Id.* at 3:6-7.

RECEIVER'S MOTION TO DISMISS - 2
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1  SERAP claim against Washington Mutual, Inc., and some (perhaps all) plaintiffs have asserted

2  their SERAP claims against Washington Mutual, Inc. in the Delaware bankruptcy proceeding.

3  But plaintiffs plainly do not have a cognizable SERAP claim against the Receiver.[3]

4  ### *Summary of Why Plaintiffs' Change-In-Control Employment Contract Claims Fail*

5  Plaintiffs' change-in-control employment contract claims are barred, as a matter of law,

6  by both an on-point federal regulation governing contracts between a thrift institution and its

7  employees **and** an on-point Ninth Circuit decision, *Modzelewski*.  Under the federal regulation,

8  plaintiffs have no entitlement to change-in-control payments because vesting – as interpreted

9  by the Ninth Circuit Court of Appeals – of such contingent payments did not occur **prior to** the

10  date the Office of Thrift Supervision ("OTS") determined plaintiffs' employer thrift to be "in

11  an unsafe or unsound condition."

12  The Court needs only three tools to dispose of plaintiffs' change-in-control employment

13  contract claims: (1) the regulation, 12 C.F.R. § 563.39, (2) the OTS's September 25, 2008

14  Order finding WMB to be "in an unsafe or unsound condition" (which federal Order is the

15  proper subject of judicial notice on a Rule 12 motion), and (3) plaintiffs' change-in-control

16  employment contracts, (also properly considered on a Rule 12 motion because they are

17  referenced in the respective complaints).  Together, the federal regulation, the OTS's Order,

18  and plaintiffs' contracts mandate dismissal of the change-in-control employment contract

19  claims against the Receiver in this lawsuit, with prejudice, as a matter of law.

20  The issues here are simple.  All plaintiffs in this consolidated lawsuit are former

21  employees of WMB, a former subsidiary of Washington Mutual, Inc.  All of plaintiffs' change-

22  in-control employment contract claims arise out of employment contracts they had with WMB.

23

24  [3]  For purposes of this Motion, and for purposes of the Court's analysis, the change-in-control employment
contract claims and the SERAP claims are completely separate.  The change-in-control employment contract
25  claims are based on numerous employment contracts that have nothing to do with the SERAP.  Given the
distinction between the change-in-control employment contracts and the SERAP, for ease of reference throughout
this Motion, all of the at-issue agreements that do not involve the SERAP will be referred to as the "change-in-
26  control employment contracts," and the claims arising out of those contracts will be referred to as the "change-in-
control employment contract claims."  The SERAP and claims arising out of SERAP will be referred to as "the
SERAP" and "the SERAP claims."

1   Each plaintiff alleges he/she is entitled to payment of certain employment benefits that, under

2   certain circumstances, were to arise under those employment contracts.

3       WMB was a federally chartered thrift that was overseen by the OTS, and was subject to

4   OTS regulation.  On September 25, 2008, by Order of the OTS, the Director of the OTS found

5   and determined WMB to be in an unsafe or unsound condition to transact business, seized

6   WMB, and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver for

7   WMB.  Since that date, the FDIC has acted in its capacity as Receiver for the failed WMB and

8   has administered the affairs of the failed institution.  According to plaintiffs' complaints, each

9   plaintiff filed a claim with the Receiver to be paid employment benefits that plaintiffs claim are

10  due under their former change-in-control employment contracts with WMB.  The Receiver

11  denied plaintiffs' claims, and plaintiffs filed numerous lawsuits in this District that were

12  consolidated into this lawsuit.

13      The simple question is whether plaintiffs are entitled to payment of the employment

14  benefits they claim they are owed under their change-in-control employment contracts.  There

15  are numerous reasons the answer to that question is No.  But one reason is so clear, as a matter

16  of law, that it compels dismissal of these claims against the Receiver on this Rule 12 motion.

17      Over thirty-five years ago, the OTS's predecessor, the Federal Home Loan Bank Board

18  (the "FHLBB"), promulgated a simple regulation.  That regulation – 12 C.F.R. § 563.39

19  ("Section 563.39") – governs contracts between thrifts (such as WMB) and their employees.

20  The purpose of Section 563.39(b) is so plain that it is commonly referred to as the "Automatic

21  Termination Provision" for thrift employment contracts.

22      Under the Automatic Termination Provision of Section 563.39, the moment certain

23  events occur, such as when the OTS Director determines a thrift is in "default" or in an "unsafe

24  or unsound condition," all obligations under employment contracts of the failed thrift (with

25  narrow exceptions not applicable here) *automatically terminate*, and only rights that were not

26  contingent and vested *prior to* the OTS Director's determination are not extinguished.  On

RECEIVER'S MOTION TO DISMISS - 4
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1   September 25, 2008, the OTS Director determined WMB was in default and in an "unsafe or
2   unsound condition" to transact business.  Thus, at that moment, all of WMB's employment
3   contracts terminated by operation of law.  The only obligations that remained under those
4   employment contracts were such obligations, if any, that had vested *prior to* September 25,
5   2008.  In *Modzelewski*, the Ninth Circuit squarely held that the benefits that plaintiffs here
6   claim (*i.e.*, change-in-control payments) do not vest *prior to* the OTS action, as a matter of law.

7   In short, all purported employment benefits that plaintiffs seek to recover through this
8   consolidated lawsuit on their change-in-control employment contracts were automatically
9   terminated on September 25, 2008, and the only way plaintiffs could even arguably be entitled
10  to payment of those "benefits" is if the right to receive such payment was not contingent but
11  existed (*i.e.*, had "vested") *prior to* September 25, 2008.  Because the purported employment
12  "benefits" at issue here did not vest prior to September 25, 2008,  plaintiffs' claims fail as a
13  matter of law.

14          ***Summary of Why the SERAP Claims Fail***

15          The SERAP claims (asserted by 35 plaintiffs) also fail as a matter of law.  The SERAP
16  plan documents are appropriate for consideration on this Rule 12 motion because they are not
17  subject to dispute and are referenced in and relied upon in the Amended Complaint.  Those
18  documents, which are public records on file with the SEC, unequivocally establish that the
19  SERAP was administered by and is the obligation of Washington Mutual, **Inc.** ("WMI"), ***not***
20  ***WMB***.  The SERAP plan on file with the SEC defines "Company" to mean WMI (not WMB)
21  and states, at Section 1.3:  "This Plan is established as an unfunded plan of deferred
22  compensation …  All Plan benefits are payable ***solely*** from the general assets of the Company
23  [*i.e.*, WMI].  Participants and Beneficiaries … shall be general unsecured creditors of the
24  Company [*i.e.*, WMI] …."  The SERAP plan could not more clearly bar plaintiffs' claim
25  against the Receiver (standing in the shoes only of WMB).

26

1    WMI is an entity that still exists and is undergoing Chapter 11 bankruptcy proceedings

2   in the United States Bankruptcy Court for the District of Delaware, Case No. 08-12229-MFW.

3   The SERAP plaintiffs' claims are properly against WMI (not the Receiver), and must be

4   pursued exclusively against Washington Mutual, **Inc.** in the District of Delaware bankruptcy

5   proceeding, not here.  Indeed, some (perhaps all) of the SERAP plaintiffs have already filed

6   their SERAP claims in the WMI bankruptcy proceeding.

7    Thus, both plaintiffs' change-in-control claims and plaintiffs' SERAP claims are plainly

8   barred as a matter of law.  The Court should grant this Motion and dismiss all of plaintiffs'

9   claims against the Receiver with prejudice.

## II.    FACTUAL BACKGROUND

11    On September 25, 2008, the Director of the OTS issued an Order that found and

12   determined WMB, a federal thrift, to be "in an unsafe or unsound condition" because of

13   WMB's "severe liquidity strain, deteriorating asset quality, and continuing significant negative

14   operating earnings with no realistic prospects for raising capital to ensure that it can repay all of

15   its liabilities, including deposits."  *See* OTS Order No. 2008-36, attached as Ex. A to the

16   Declaration of Stellman Keehnel in Support of Motion to Dismiss Pursuant to FRCP 12(b)(6)

17   and for Judgment on the Pleadings Pursuant to FRCP 12(c) (the "Keehnel Decl."), filed

18   herewith.[4]  Accordingly, "[t]he Director of the Office of Thrift Supervision …, in cooperation

---

[4]  The OTS Order is the proper subject of judicial notice on this motion, and the Receiver respectfully requests that the Court take judicial notice of OTS Order No. 2008-36.  Courts may properly take judicial notice of OTS orders and resolutions on a Rule 12 motion without converting it to a Rule 56 motion.  *See Rush v. Federal Deposit Ins. Corp.*, 747 F. Supp. 575, 577 n.3 (N.D. Cal. 1990) ("Defendants request the Court to take judicial notice of Federal Home Loan Bank Board Resolution Nos. 87-475 & 87-476 (Apr. 24, 1987), and attach copies of these resolutions.  The Court takes notice of these resolutions pursuant to Federal Rule of Evidence 201(d)."); *Nugget Hydroelectric v. Pacific Gas & Elec.*, 981 F.2d 429, 435 (9th Cir. 1992) (court took judicial notice of regulatory decisions/orders on Rule 12 motion); *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) ("On a motion to dismiss, we may take judicial notice of matters of public record outside the pleadings.").  Courts regularly take judicial notice of federal regulatory orders because such orders fit precisely the contours of FRE 201(b) ("not subject to reasonable dispute" because "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").  As in the above-noted precedents and in legions of additional authorities, consideration of such matters of public record does not convert a Rule 12 motion to a Rule 56 motion.  *See, e.g., Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986), overruled on other grounds by *Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166 (1991) ("on a

with the Federal Deposit Insurance Corporation[,] … determined to appoint the FDIC as receiver of Washington Mutual Bank …." *Id.* The FDIC has acted as the Receiver for the failed WMB since its appointment on September 25, 2008.

After being appointed Receiver, on September 25, 2008, the Receiver entered into a Purchase and Assumption Agreement with JPMorgan Chase Bank, N.A. (the "P&A Agreement").[5] As alleged in the various complaints, the plaintiffs in this consolidated lawsuit continued in their bank jobs, but through a new division of JPMorgan Chase. Over the course of the next several months, as alleged by plaintiffs, each of the plaintiffs' employment with JPMorgan Chase was terminated.[6]

Thereafter, according to plaintiffs, each plaintiff submitted an administrative claim with the Receiver seeking compensation under their employment contracts. Plaintiffs each allege that he/she timely and properly filed his/her administrative claim for benefits.[7] While differing slightly from claim to claim, in essence, each claim submitted to the Receiver sought payment

---

motion to dismiss a court may properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment"); *Intri-Plex Technologies, Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) ("[a] court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment, as long as the facts noticed are not subject to reasonable dispute.") (quoting *Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir. 2001)). In addition, plaintiffs reference OTS Order No. 2008-36 in their various complaints, both by name and by reference to the OTS's action. *See, e.g.,* Bjorklund Complaint, Case No. C09-0691, ¶ 15 ("On or around September 25, 2008, . . . WMB was seized by the Director of the Office of Thrift Supervision by Order No. 2008-36"); Day Complaint, Case No. C09-0684,  ¶ 10 ("the OTS, by order number 2008-36, took control of WMB"). Thus, the Court can properly consider OTS Order No. 2008-36 on this Rule 12 motion (without converting it to a Rule 56 motion) for the second, independent reason that the OTS Order is referenced in the complaints. *See Sgro v. Danone Waters of North America, Inc.,* 532 F.3d 940, 943 n.1 (9th Cir. 2008) (on a Rule 12 motion to dismiss, the court can consider documents plaintiff "refers to … in his complaint"); *Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000) (on a Rule 12 motion, the court can consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading").

[5] *See* Day Complaint, Case No. C09-0684, ¶ 4.

[6] *See, e.g.,* Amended Complaint, Case No. C09-0504, ¶ 60.

[7] *See, e.g.,* Wyckoff Complaint, Case No. C09-0689, ¶ 10 ("each of the above-named plaintiffs filed claims with the FDIC to recover funds due and owing"). Whether each plaintiff submitted a timely and proper claim seeking benefits with the Receiver is not at issue in this Motion. The Receiver does not concede that each plaintiff timely and properly submitted a claim.

RECEIVER'S MOTION TO DISMISS - 7
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1   for certain contingent employment benefits under each plaintiff's employment contract(s).[8]

2   The Receiver denied those claims as not valid receivership claims.[9]   This consolidated lawsuit

3   followed, through which plaintiffs initially sought relief from this Court under their change-in-

4   control employment contracts.[10]   On October 1, 2010, having received leave of Court to do so,

5   plaintiffs filed an amended complaint in Case No. C09-0504 asserting claims by 35 plaintiffs

6   against the Receiver for purported benefits under the Washington Mutual, Inc. Supplemental

7   Executive Retirement Accumulation Plan.

8       **A.**    **The Change-In-Control Employment Contracts**

9           Three types of contracts are at issue here — Change-In-Control Agreements, Severance

10   Plan Agreements, and Retention Agreements.  Each plaintiff allegedly had one or more of these

11   contracts with WMB.[11]   There are no material differences in these employment contracts that

12   would require them to be treated any differently on this Motion.[12]

13

14   _____

15   [8]   *See, e.g.*, Melby First Amended Complaint, Case No. C09-0750, ¶ 21 ("Plaintiffs filed claims with the FDIC to recover funds due and owing based on the change of control contract and other liability of the FDIC."); Thompson Complaint, Case No. C09-0715, ¶ 9 ("plaintiff filed a claim with the FDIC to recover funds due and owing based upon the change of control").

16

17   [9]   *See, e.g.*, Conway Second Amended Complaint, Case No. C09-0781, ¶ 23 (the Receiver "refus[ed] to honor Plaintiffs' claims"); Day Complaint, Case No. C09-0684, ¶ 4 ("Plaintiff filed an administrative claim against the receivership …, and this action was commenced [as a result of] disallowance of that claim"); Herres Complaint, Case No. C09-0798, ¶ 10 (the Receiver "refus[ed] to honor the plaintiff's claim under the change in control clauses of their contracts").

18

19   [10]   In total, 21 separate lawsuits were filed by plaintiffs in this District – Case Nos. C09-0504, C09-0528, C09-0543, C09-0553, C09-0568, C09-0570, C09-0573, C09-0684, C09-0689, C09-0691, C09-0692, C09-0711, C09-0715, C09-0750, C09-0781, C09-0798, C09-0827, C09-0847, C09-0866, C09-1632, and C09-1666.  One of those lawsuits, C09-0827, was dismissed as a duplicative lawsuit, with prejudice, on August 25, 2009, pursuant to stipulation of the parties.  The remaining 20 lawsuits were consolidated into this consolidated lawsuit, bearing Master File No. C09-0504, pursuant to the Order of this Court on September 2, 2009.

20

21

22

23   [11]   Most plaintiffs had only a Change-In-Control Agreement with WMB.  A relatively small number of plaintiffs had a Retention Agreement.  Even fewer had a Severance Plan Agreement with WMB.  A handful of plaintiffs had more than one of these types of agreements with WMB, but the majority of plaintiffs had only a Change-In-Control Agreement.  So the Court is clear on which plaintiffs had which employment agreements, for the Court's convenience, the Receiver has attached as Exhibit B to the Keehnel Declaration a chart listing each plaintiff and the type of employment agreement he or she had with WMB.

24

25

26   [12]   In addition to the chart provided at Exhibit B of the Keehnel Declaration, copies of each of the employment, severance and retention agreements that the Receiver has received in this consolidated lawsuit are attached to the Keehnel Declaration as Exhibits J to O.

RECEIVER'S MOTION TO DISMISS - 8
Master File No. C09-0504-RAJ

1       The structure common to all three types of contracts is that if specified triggering events

2   occurred, specified payment would be made to the employee.   For Change-In-Control

3   Agreements, the specified triggering event was a change-in-control event plus termination of

4   the employee's job within a certain amount of time after that change-in-control event.

5       Severance Plan Agreements and Retention Agreements contained change-in-control

6   provisions with the same trigger as the Change-In-Control Agreements.   In addition, Severance

7   Plan Agreements and Retention Agreements also provided for payments upon other specified

8   triggering events that did not necessarily require a change-in-control, but none of those

9   additional triggering events occurred.   The three different types of agreements are described in

10   greater detail below.

11       <u>None</u> of the necessary triggering events, under <u>any</u> of the three types of employment

12   agreements, occurred before the contracts were automatically terminated by Section 563.39.

13   Thus, as discussed in Part III.B below, all of plaintiffs' claims, under all three types of

14   employment contracts, are barred by Section 563.39.

15       1.   <u>The Change-In-Control Agreements</u>

16       By far the predominant type of employment agreement that existed between WMB and

17   plaintiffs was a Change-In-Control Agreement.   The plaintiffs who had such agreements were

18   to receive a lump-sum payment of 150% (in some agreements) or 200% (in other agreements)

19   of their annual salary *if* there was a change-in-control event, as defined by the agreements, ***and***

20   ***if*** their employment terminated within 18 months (in some agreements) or two years (in other

21   agreements) of that change-in-control event.   Thus, a right to payment under the Change-In-

22   Control Agreements ***did not exist*** (*i.e.*, ***did not vest***) unless and until there was a change-in-

23   control event <u>and</u> termination of the employee within a defined period of time after that

24   change-in-control event.

25

26

RECEIVER'S MOTION TO DISMISS - 9
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1    The Change-In-Control Agreements at issue in this consolidated lawsuit contain the

2 following triggering language (or language that is materially the same for purposes of this

3 Motion):

> If (i) Employee's employment is terminated by Washington Mutual or its
> successor without "cause" … or (ii) Employee resigns for "good reason"
> … within two years after a Change in Control …, then Employee shall be
> entitled to receive …, from Washington Mutual or its successor, a lump
> sum equal to two times Employee's annual compensation.

*See* Keehnel Decl., Ex. C (Plaintiff Freilinger's Change-In-Control Agreement § 5(c)).[13]

### 2.    The Severance Plan Agreements

A handful of plaintiffs assert claims against the Receiver based on Severance Plan

Agreements with WMB.    There are two different types of triggering events under the

Severance Plan Agreements.    The first is materially the same as the triggering event in the

Change-In-Control Agreements – *i.e.*, a change-in-control and termination of employment.[14]

---

[13]  The Change-In-Control Agreements define "Change in Control" as follows (or in materially the same way):

> 1.    The acquisition of ownership, directly or indirectly, beneficially or of record, by any Person …
> or group … of [Washington Mutual, Inc.], or its Subsidiaries, of shares representing more than 25%
> of (i) the common stock of [Washington Mutual, Inc.], (ii) the aggregate voting power of
> [Washington Mutual, Inc.]'s voting securities or (iii) the total market value of [Washington Mutual,
> Inc.]'s voting securities;

> 2.    During any period of 25 consecutive calendar months, a [majority change in] the Board of
> Directors of [Washington Mutual, Inc.];

> 3.    The good-faith determination by the Board that any Person or group … has acquired direct or
> indirect possession of the power to direct or cause to direct the management or policies of
> [Washington Mutual, Inc.];

> 4.    The merger, consolidation, share exchange or similar transaction between the Company and
> another Person [with exceptions not relevant here]; or

> 5.    The sale or transfer (in one transaction or a series of related transactions) of all or substantially
> all of [Washington Mutual, Inc.]'s assets to another Person (other than a Subsidiary) whether assisted
> or unassisted, voluntary or involuntary.

*See* Keehnel Decl., Ex. C (Plaintiff Freilinger's Change-In-Control Agreement § 5(g)).  For all purposes material
to this Motion, all of plaintiffs' Change-In-Control Agreements are the same as Plaintiff Freilinger's Change-In-
Control Agreement.

[14]  The Severance Plan Agreements define change-in-control the same as the Change-In-Control Agreements.
*Compare* note 13, *supra*, to Keehnel Decl., Ex. D (Plaintiff Bjorklund's Severance Plan Agreement ¶ 1.5).

RECEIVER'S MOTION TO DISMISS - 10
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

The second did not require a change-in-control event, but triggered upon job elimination under certain circumstances – *i.e.*, if "[e]mployee's position is eliminated because of corporate restructuring, downsizing, or a reduction in force and, as a result, his employment with the Company terminates."[15]

The Severance Plan Agreements contain the following triggering language (or language that is materially the same for purposes of this Motion):

> [An employee] will be entitled to Severance Pay equal to one and a half times his annual compensation . . . if his employment is terminated for any reason other than for Cause within 18 months after the Change in Control.…

*See*, *e.g.*, Keehnel Decl., Ex. D (Plaintiff Bjorklund's Severance Plan Agreement ¶ 3.2(d)).

> [An employee] will be eligible for benefits … if …[employee's] position is eliminated because of corporate restructuring, downsizing, or a reduction in force and, as a result, his employment with the Company terminates."

*See id.* at ¶¶ 2.1 & 2.3.

Thus, while the Severance Plan Agreements are titled something different and were entered into by a select group of plaintiffs, the Severance Plan Agreements are functionally the same as the Change-In-Control Agreements – *i.e.*, a right to payment under the Severance Plan Agreements **did not exist** unless and until these certain defined events occurred.  As discussed below, there was no change-in-control event triggering payment obligations **prior to** WMB's failure, and plaintiffs' own allegations establish that none of their jobs were eliminated due to corporate restructuring, downsizing, or a reduction in force **prior to** the OTS seizing WMB on September 25, 2008.[16]

---

[15]  *See* Keehnel Decl., Ex. D (Plaintiff Bjorklund's Severance Plan Agreement ¶¶ 2.1 & 2.3).

[16]  *See*, *e.g.*, Day Complaint, Case No. C09-0684, ¶ 22 (job eliminated January 29, 2009); Freilinger Complaint, Case No. C09-0692, ¶ 14 (job eliminated December 3, 2008).

1

### 3.     The Retention Agreements

2      A small number of plaintiffs assert claims based on Retention Agreements they had

3  with WMB.[17]   While labeled differently, the Retention Agreements have the same features as

4  the Change-In-Control Agreements and the Severance Plan Agreements.   The Retention

5  Agreements provided for payment of employee benefits under either (1) a change-in-control

6  event that is functionally identical to triggering events referenced in the Change-In-Control

7  Agreements discussed above, or, in some cases, (2) other provisions where the triggering event

8  for payment was termination or job elimination.

9      The Retention Agreements contain the following triggering language (or language that

10  is materially the same for purposes of this Motion):

11
12          [Y]ou will be [entitled to payment] if, within two years after a change in
            control (as defined in Section 5(g) of your Change In Control ("CIC"
13          Agreement), your employment is terminated by the Company or a
            successor for any reason other than for cause . . . or you resign for good
14          reason . . . .

15  *See* Keehnel Decl., Ex. F (Plaintiff Laubsted's Retention Agreement, p. 1).

16          [I]f your job is eliminated (as defined in the WaMu Severance Plan [as
            described above]) you will be [entitled to payment.]
17
18  *See id*.

19      In other words, although called something different (a "Retention Agreement"), these

20  agreements, too, are functionally identical to the Change-In-Control Agreements and Severance

21  Plan Agreements – *i.e.*, for a right to payment under these contracts to exist, there had to be a

22  change-in-control event plus termination or, in some cases, the employee's employment with

23

24

25

26  [17]  Although referred to as "Retention Agreements" in this Motion and by plaintiffs, most of the agreements are set
forth in letters with the following title in the subject line:  "Special Bonus Opportunity."  *See*, *e.g.*, Keehnel Decl.,
Ex. F (Plaintiff Laubsted's Retention Agreement).

RECEIVER'S MOTION TO DISMISS - 12
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1   WMB had to be eliminated although there was not a change-in-control.  Again, neither of those

2   events occurred before WMB failed on September 25, 2008.[18]

3          4.      All Of Plaintiffs' Change-In-Control Employment Contracts Are
                   Materially The Same
4

5          As the above discussion reveals, all of the change-in-control employment contracts

6   underlying plaintiffs' claims provided for benefits that were contingent on triggering events,

7   none of which occurred prior to September 25, 2008.  Thus, for purposes of this Motion, all of

8   plaintiffs' employment contracts at issue here are the same.   No plaintiff was entitled to

9   payment under the employment contracts **prior to** September 25, 2008 when WMB failed.

10  Every plaintiff's alleged entitlements were contingent on events that did not occur **prior to** the

11  OTS's action.  In brief, the claimed benefits did not vest **prior to** the date the employment

12  contracts were extinguished by operation of law.

13         5.      Causes of Action Asserted By Plaintiffs Against The Receiver Based
                   Upon The Change-In-Control Employment Contracts
14

15         Because this is a consolidated lawsuit that brought together 20 complaints, not all

16  plaintiffs in this consolidated lawsuit assert the same causes of action against the Receiver.  Yet

17  all of the following causes of action arise out of the above-discussed change-in-control

18  employment contracts, and all of the causes of action fail as a matter of law.  The causes of

19  action asserted against the Receiver are as follows:

20         1.      Breach of contract.  All plaintiffs assert a breach of contract claim against the
                   Receiver, alleging the Receiver breached the employment contract(s) each
21                 plaintiff had with WMB by not paying employment benefits.[19]

22         2.      Wrongful withholding of wages.   Several plaintiffs allege the Receiver
                   wrongfully withheld wages.[20]
23

---

24  [18]  *See* Part III.B, below; Williams Complaint, Case No. C09-0504, ¶ 9 (position eliminated February 3, 2009);
     Zalutsky Complaint, Case No. C09-0866, ¶ 13 (plaintiff continued to work for JPMorgan Chase until terminated);
25   Bjorklund Complaint, Case No. C09-0691, ¶ 17 ("On September 26, 2008, Bjorklund was relieved of his duties").

     [19]  *See* complaints in Case Nos. C09-0504, C09-0528, C09-0543, C09-0553, C09-0568, C09-0570, C09-0573,
26   C09-0684, C09-0689, C09-0691, C09-0692, C09-0711, C09-0715, C09-0750, C09-0781, C09-0798, C09-0847,
     C09-0866, and C09-1666.  A few plaintiffs articulate their breach of contract cause of action as a "wrongful denial
     of claims."  *See* complaints in Case Nos. C09-0504, C09-0684, C09-0691, and C09-0692.

RECEIVER'S MOTION TO DISMISS - 13                           DLA Piper LLP (US)
Master File No. C09-0504-RAJ                            701 Fifth Avenue, Suite 7000
                                                       Seattle, WA  98104 • Tel: 206.839.4800

3.   Conversion.  One plaintiff alleges the Receiver's "failure" to pay employee benefits under his employment contract constitutes conversion.[21]

4.   Violation of the Contract Clause of the United States Constitution.  One plaintiff alleges that by not paying employee benefits under the employment contract the Receiver violated the Contract Clause of the United States Constitution.[22]

5.   Unconstitutional taking.  Plaintiffs in three lawsuits allege that the Receiver's "failure" to pay employee benefits under their employment contracts constituted an unconstitutional taking.[23]

6.   Estoppel (WMB's receiver).  A handful of plaintiffs allege that the Receiver should be estopped from denying their claims because the Receiver must act in WMB's shoes and, according to those plaintiffs, WMB is obligated to pay their claims.[24]

7.   Estoppel (claim denial).  A handful of plaintiffs allege that the Receiver should be estopped from denying their claims because the Receiver allegedly provided inconsistent reasons for such denial.[25]

8.   Disaffirmance of claim ineffective.  A number of plaintiffs allege that the Receiver did not disaffirm their employment contracts within a "reasonable" time.[26]

**B.**    **The SERAP**

On October 1, 2010, some of the plaintiffs in this consolidated lawsuit amended their complaints to add a claim against the Receiver for purported benefits under the Washington Mutual, Inc. Supplemental Executive Retirement Accumulation Plan.  The SERAP was a deferred compensation plan offered by Washington Mutual, Inc. to certain of its employees and

---

[20]  *See* Case No. C09-0553, Complaint ¶ 20 ("The monies due and owing from the change of control agreements constitute wages already earned by the plaintiffs."); *see also* complaints in Case Nos. C09-0528, C09-0543, C09-0573, C09-0689, C09-0691, C09-0692, C09-0715, C09-0798, and C09-0847 (similar).

[21]  *See* Complaint in Case No. C09-0692.

[22]  *See* Complaint in Case No. C09-0866.

[23]  *See* complaints in Case Nos. C09-0504, C09-0570, and C09-0866.

[24]  *See* complaints in Case Nos. C09-0711, C09-0750, C09-0781, and C09-1666.  Arguably, this estoppel claim is simply a poorly crafted breach of contract claim.  For the sake of argument, however, it is treated separately in this Motion.

[25]  *See* complaints in Case Nos. C09-0504, C09-0692, C09-0570, and C09-0691.

[26]  *See* complaints in Case Nos. C09-0504, C09-0570, and C09-0866.

RECEIVER'S MOTION TO DISMISS - 14
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1   offered by Washington Mutual, Inc. to some employees of certain Washington Mutual, Inc.

2   affiliated companies.   SERAP benefits were not offered by WMB to its employees, but by

3   WMB's corporate parent, WMI, to certain WMB employees (and employees of other related

4   entities) in order to supplement the benefit package that WMB (and other related entities)

5   offered those employees.   Thus, as the judicially noticeable documents discussed below

6   establish, WMB (and, therefore, the Receiver) has never had any contractual obligation to the

7   SERAP plaintiffs under the SERAP.  The SERAP obligation belongs solely to WMI.

8       Washington Mutual, Inc. is currently undergoing bankruptcy proceedings in the United

9   States Bankruptcy Court for the District of Delaware.  A number of the SERAP plaintiffs in

10  this lawsuit have submitted claims in that bankruptcy proceeding, seeking SERAP benefits

11  from WMI's bankruptcy estate.  Apparently concerned that the WMI bankruptcy estate may not

12  have the assets to pay the benefits they claim, the SERAP plaintiffs are now seeking SERAP

13  benefits from the Receiver.  The SERAP plaintiffs assert a breach of contract claim in this

14  consolidated lawsuit against the Receiver based upon the SERAP.[27]

15      As discussed below, each of these purported causes of action is subject to dismissal as a

16  matter of law.

17  **III.     AUTHORITY AND ARGUMENT**

18      **A.     Applicable Legal Standards**

19      The Receiver brings this Motion pursuant to FED. R. CIV. P. 12(b)(6) and 12(c).  Under

20  both Rules 12(b)(6) and 12(c), dismissal is appropriate where plaintiffs do not allege

21  cognizable legal theories, and the moving party is entitled to judgment as a matter of law.

22  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988) (Rule 12(b)(6) dismissal

23  is proper on either a "lack of a cognizable legal theory" or "the absence of sufficient facts

24  alleged under a cognizable legal theory"); *Gen. Conference Corp. of Seventh-Day Adventists v.*

25  *Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989) (under Rule

26  ───────────────

[27] *See* Amended Complaint, Case No. C09-0504, ¶¶ 80-84.

RECEIVER'S MOTION TO DISMISS - 15
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1   12(c), "[j]udgment on the pleadings is proper when there are no issues of material fact, and the

2   moving party is entitled to judgment as a matter of law").   The Ninth Circuit has long held that

3   the standard applied on Rule 12(b)(6) motions and Rule 12(c) motions is the same.   *Hal Roach*

4   *Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990) (recognizing

5   Rule 12(c) standard is same as Rule 12(b)(6) standard); *Liebb v. Daly*, Case Nos. C04-0950 &

6   C04-4213, 2008 WL 902110, at *2 (N.D. Cal. Mar. 31, 2008) (same); *Dworkin v. Hustler*

7   *Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) (because Rules 12(c) and 12(b)(6) motions

8   are "functionally identical," the legal standards applicable to both are the same).   Under this

9   standard, factual allegations must be enough to raise a right to relief above the speculative

10  level.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007).

11          In ruling on this Motion, the Court need not accept as true any conclusory allegations,

12  legal conclusions, unwarranted deductions of fact, or unreasonable inferences alleged by

13  plaintiffs.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).   Further,

14  and important for the SERAP claims, the Court "need not … accept as true allegations that

15  contradict matters properly subject to judicial notice …."  *Id.*

16          On a Rule 12 motion, the allegations in the complaint should be dismissed *with*

17  prejudice if amendment of the complaint would be futile.   *See Lipton v. Pathogenesis Corp.*,

18  284 F.3d 1027, 1039 (9th Cir. 2002).   As discussed below, plaintiffs have not alleged, and

19  cannot allege, facts establishing that plaintiffs are entitled to relief.   Therefore, the Receiver is

20  entitled to dismissal of plaintiffs' claims and for judgment on the pleadings, as a matter of law,

21  pursuant to FED. R. CIV. P. 12(b)(6) and 12(c).   Dismissal should be with prejudice both

22  because plaintiffs have had numerous opportunities to amend and because no conceivable

23  amendment of the claims could remove the reasons for dismissal.

24          **B.     All Of Plaintiffs' Change-In-Control Employment Contract Claims Fail As
              A Matter Of Law Under 12 C.F.R. § 563.39**

25

26          As discussed above, all of plaintiffs' change-in-control employment contract claims in

    this consolidated lawsuit arise out of employment contracts between plaintiffs and the former

1   WMB.   Because WMB was a federally regulated thrift,[28] WMB and, by extension, the

2   employment contracts between WMB and its employees, were subject to OTS regulation.[29]

3   One of the regulations governing WMB and its employment contracts is 12 C.F.R. § 563.39,

4   and the Automatic Termination Provision contained in that regulation.[30]   Section 563.39 has the

5   same force and effect as a federal statute.   *See, e.g.*, *Fidelity Fed. Sav. & Loan Ass'n v. De la*

6   *Cuesta*, 458 U.S. 141, 153 (1982) (federal regulations such as those promulgated by the

7   FHLBB have the same force as federal statutes).[31]

8           1.      <u>All Of Plaintiffs' Change-In-Control Employment Contracts That Are At
        Issue In This Consolidated Lawsuit Terminated By Operation Of Law</u>
9           <u>On September 25, 2008</u>

10          Pursuant to the Automatic Termination Provision, all WMB employment contracts

11  terminated when the Director of the OTS determined WMB was in default and appointed a

12  receiver and, alternatively, when the Director determined WMB was in an "unsafe or unsound

13  condition."   Section 563.39 provides:

14

15  _____

16  [28]   The OTS Order (properly subject to judicial notice) identifies WMB as a federally chartered savings association (*i.e.*, a thrift).   Similarly, Washington Mutual, Inc.'s Form 10-K for the fiscal year ended December 31, 2006, filed with the Securities and Exchange Commission on March 1, 2007, reflects that WMB was a federally regulated

17  thrift.   *See* Keehnel Decl., Ex. P at 8 (WMB was "[o]ne of [Washington Mutual, Inc.'s] savings associations").   The Court may take judicial notice of this Securities and Exchange Commission filing without converting this

18  Motion to a Rule 56 motion, and the Receiver requests the Court do so.   *Dreiling v. American Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (on a motion to dismiss, court may properly take judicial notice of SEC filings

19  without converting the motion to a Rule 56 motion); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (judicial notice of SEC filings on Rule 12 proper); *see also*, footnote 4, above.

20  [29]   Prior to 1989, thrifts were regulated by the Federal Home Loan Bank Board.   In 1989, through the Financial

21  Institutions Reform, Recovery and Enforcement Act of 1989 (Pub. L. No. 101-73, 103 Stat. 183 (Aug. 9, 1989)) ("FIRREA"), Congress transferred the function of overseeing and regulating thrifts to the OTS, a function that the

22  OTS continues to perform to this day.

    [30]   When FIRREA was enacted, and regulatory oversight of thrifts was transferred from the FHLBB to the OTS,
23  FIRREA provided that all FHLBB regulations in force and effect on the day prior to enactment of FIRREA would
    remain in effect and enforceable by the OTS unless and until modified or cancelled by the OTS.   *See* FIRREA,
24  Title VI, Section 401(h); *accord Great Western Bank v. Office of Thrift Supervision*, 916 F.2d 1421, 1423 n.1 (9th Cir. 1990).   On November 30, 1989, the OTS took the affirmative step of endorsing the ongoing application of
25  12 C.F.R. § 563.39 by formally adopting that section without change.   *See* 54 Fed. Reg. 49411 (Nov. 30, 1989).

26  [31]   *See also Del E. Webb McQueen Dev. Corp. v. Resolution Trust Corp.*, 69 F.3d 355, 358 (9th Cir. 1995) (recognizing the FLHBB's "plenary authority to make rules and adopt regulations governing receiverships and conservatorships of savings and loan associations").

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1

2

(a)   General.   A savings association may enter into an employment contract with its officers and other employees only in accordance with the requirements of this section.  …

3

(b)   Required provisions.   Each employment contract shall provide that: …

4

5

6

7

(4) *If the savings association is in default* (as defined in section 3(x)(1) of the Federal Deposit Insurance Act), *all obligations under the contract shall terminate as of the date of default, but this paragraph (b)(4) shall not affect any vested rights of the contracting parties*:  Provided, that this paragraph (b)(4) need not be included in an employment contract if prior written approval is secured from the Director or his or her designee.

8

9

(5)  *All obligations under the contract shall be terminated*, except to the extent determined that continuation of the contract is necessary of [sic] the continued operation of the association

10

11

12

(i) By the Director or his or her designee, at the time the Federal Deposit Insurance Corporation or Resolution Trust Corporation enters into an agreement to provide assistance to or on behalf of the association under the authority contained in 13(c) of the Federal Deposit Insurance Act; or

13

14

(ii) By the Director or his or her designee, at the time the Director or his or her designee approves a supervisory merger to resolve problems related to operation of the association or *when the association is determined by the Director to be in an unsafe or unsound condition*.

15

*Any rights of the parties that have already vested, however, shall not be affected by such action*.

16

17

18

19

20

21

22

23

24

25

26

12 C.F.R. § 563.39 (emphasis added).  Thus, under Section 563.39, all obligations under all employment contracts (with certain narrow exceptions not applicable here) are *automatically terminated* by operation of law (1) at the moment the OTS Director determines that an OTS-regulated thrift "is in default," which determination is automatic at the time of appointment of FDIC as receiver (Section 563.39 ¶ (b)(4)) *or* (2) at the moment the OTS Director determines the thrift is "in an unsafe or unsound condition" (Section 563.39 ¶ (b)(5)).  *See Aronson v. Resolution Trust Corp.*, 38 F.3d 1110, 1113 (9th Cir. 1994) (Automatic Termination Provision of Section 563.39(b)(4) triggered when thrift is in "default"); *Romines v. Great-West Assur. Co.*, 73 F.3d 1457, 1462 (8th Cir. 1996) (OTS determination that thrift was in "unsafe or unsound" condition triggered Automatic Termination Provision of Section 563.39(b)(5)).  The

RECEIVER'S MOTION TO DISMISS - 18
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1  only employee rights or benefits that are not affected by the Automatic Termination Provision

2  of Section 563.39 are those rights that are **already vested**.[32]  *Id.*

3      On September 25, 2008, the Director of the OTS determined that WMB was in

4  "default" and was "in an unsafe or unsound condition."  Specifically, on September 25, 2008,

5  the OTS Director issued Order No. 2008-36.  That Order states:  "The Director of the Office of

6  Thrift Supervision …, in cooperation with the Federal Deposit Insurance Corporation …

7  appoint[ed] the FDIC as receiver for [WMB]."  Keehnel Decl., Ex. A (OTS Order No. 2008-

8  36).   Under Section 563.39(b)(4), a thrift is in "default" for purposes of the Automatic

9  Termination Provision the moment the OTS determines to appoint a receiver.   Section

10  563.39(b)(4) says "default" means "as defined in section 3(x)(1) [12 U.S.C. § 1813(x)(1)] of

11  the Federal Deposit Insurance Act [FDIA,]" which states:

12      The term "default" means, with respect to an insured depository
        institution, any adjudication or other official determination by … the
13      appropriate Federal banking agency … pursuant to which a
        conservator, **receiver**, or other legal custodian is appointed for an
14      insured depository institution ….

15  12 U.S.C. § 1813(x)(1) (emphasis added).  Thus, the moment the OTS appointed FDIC as the

16  receiver for WMB (as it did on September 25, 2008 through Order No. 2008-36), WMB was in

17  "default" for purposes of Section 563.39(b)(4), and the Automatic Termination Provision was

18  triggered.[33]

19      Likewise, OTS Order No. 2008-36 specifically states that on September 25, 2008, the

20  Director of the OTS determined WMB to be "in an unsafe or unsound condition to transact

21

---

22  [32]   Notably, even if a thrift's employment contracts do not expressly include the language contained in
23  Section 563.39, the terms of that provision are still a part of those contracts.  *See Modzelewski v. Resolution Trust
    Corp.*, 14 F.3d 1374, 1380 (9th Cir. 1994) ("If an employment contract fails to contain [12 C.F.R. 563.39], it is
24  read into the contract as an implied term") (concurring opinion); *Barnes v. Resolution Trust Corp.*, Case No. C91-
    2011, 1992 WL 25203, at *3 (D. Kan. 1992) (Section 563.39 found to be a term of plaintiff's employment
25  contract); *Rush v. Federal Deposit Ins. Corp.*, 747 F. Supp. 575, 577 (N.D. Cal. 1990) ("If not included, [12 C.F.R.
    § 563.39] is nonetheless read into an employment contract").

26  [33]   Under Section 563.39(b)(4), FDIA section 3(x)(1), and OTS Order No. 2008-36, it cannot reasonably be
    disputed that WMB was in default for purposes of Section 563.39(b)(4) on September 25, 2008.  *See Aronson*, 38
    F.3d at 1113 (Section 563.39(b)(4) triggered when thrift went into receivership).

RECEIVER'S MOTION TO DISMISS - 19
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1   business."  Keehnel Decl., Ex. A (OTS Order No. 2008-36).  Section 563.39(b)(5) clearly

2   provides that the Automatic Termination Provision is triggered the moment a thrift is declared

3   by the Director of the OTS to be in an "unsafe or unsound condition."  12 C.F.R.

4   § 563.39(b)(5); *Crocker v. Resolution Trust Corp.*, 839 F. Supp. 1291, 1293 (N.D. Ill. 1993)

5   (Section 563.39(b)(5) triggered when OTS declared thrift "in an unsafe and unsound

6   condition").

7          The regulation is clear.  "If the savings association is in default…, all obligations under

8   the [employment] contract shall terminate as of the date of default…."  12 C.F.R.

9   § 563.39(b)(4).  "All obligations under the [employment] contract shall be terminated … when

10   the association is determined by the Director [of the OTS] to be in an unsafe or unsound

11   condition."  12 C.F.R. § 563.39(b)(5).  Thus, on September 25, 2008, the moment the OTS

12   issued Order No. 2008-36,[34] all employment contracts between WMB and its employees (with

13   certain possible exceptions not at issue here) were automatically terminated by operation of

14   law.  This includes all of the employment contracts underlying this consolidated lawsuit.

15          Because their employment contracts with WMB terminated on September 25, 2008, the

16   only way any plaintiff in this lawsuit could even conceivably be entitled to payment of the

17   claims they assert under their change-in-control employment contracts is if their entitlement to

18   payment from WMB ***vested*** ***underline*** ***to*** September 25, 2008 (*i.e.*, if plaintiffs were entitled to

19   payment under their employment contracts with WMB *before* WMB's failure on September 25,

20   2008).  The regulation carves out from its Automatic Termination Provisions "rights that have

21   already vested."  12 C.F.R. § 563.39(b).  As we discuss below, the Ninth Circuit has squarely

22

23

_____

24   [34]  By asserting in this Motion that Section 563.39 was triggered on September 25, 2008, the Receiver does not
concede that Section 563.39 was not triggered at an earlier time.  Prior to the OTS issuing Order No. 2008-36,

25   WMB was a failing institution, and it may be the case that Section 563.39 was triggered prior to September 25,
2008.  But for purposes of this Rule 12 motion, and for the dismissal of plaintiffs' claims, it is sufficient that the

26   Automatic Termination Provision of Section 563.39 was unquestionably triggered, with respect to WMB's
employment contracts, including the change-in-control employment contracts at issue in this consolidated lawsuit,
on September 25, 2008.

held that the types of "entitlements" claimed by plaintiffs here do not, as a matter of law, vest prior to the OTS's actions.

### 2.   None Of Plaintiffs' Claims Vested Prior To Termination

In order for plaintiffs' "entitlement" to payment under the various employment contracts at issue in this consolidated lawsuit to vest, one or more of the following had to occur:

- A change-in-control event plus termination from employment. (This is the trigger in all Change-In-Control Agreements, all Severance Plan Agreements, and most Retention Agreements.)

- Elimination of the employee's position. (This is the trigger in a small number of Retention Agreements and in all Severance Plan Agreements.)

- In a few cases, only termination or only a change-in-control event. (This is the trigger in a very small number of Retention Agreements.)

None of these triggering events occurred for *any* of the plaintiffs **prior to** the automatic termination of their employment contracts on September 25, 2008.[35]   Thus, none of the plaintiffs is entitled to payment on the change-in-control employment contract claims they are asserting in this consolidated lawsuit.

### a.   The OTS's Seizure Of WMB And The Sale Of WMB Assets To JPMorgan Chase Did Not, As A Matter Of Law, Trigger Payment Obligations To Plaintiffs

Plaintiffs argue that the failure of WMB, its seizure by the OTS, and the events surrounding the sale of its assets to JPMorgan Chase somehow constituted a change-in-control

---

[35]  Specifically, plaintiffs' complaints do not identify an actual change-in-control event, as defined by the various agreements, *prior* to September 25, 2008 (although plaintiffs try futilely – as explained below – to find an earlier change-in-control event). Plaintiffs also do not, and cannot, allege that any of the plaintiffs were terminated, or that their positions were eliminated, prior to September 25, 2008. To the contrary, plaintiffs candidly allege that they were not terminated prior to the OTS seizure of WMB on September 25, 2008, but that their employment terminated thereafter. *See, e.g.*, Amended Complaint, Case No. C09-0504, ¶ 60 ("Each plaintiff … work[ed] for WMB from the date of employment, through the change of control, until their termination by Chase"); Bjorklund Complaint, Case No. C09-0691, ¶¶ 17 & 19 ("On September 26, 2008, Bjorklund was relieved of his duties as Funding and Liquidity Manager …. Bjorklund was notified on November 5, 2008 that his employment with JPM was eliminated as a result of JPM's control over WMB assets and former WMB employees including Bjorklund, and that his termination date would be January 3, 2009"); Day Complaint, Case No. C09-0684, ¶ 18 ("After WMB was placed into receivership, Plaintiff's employment with WMB ended.").

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1   event that triggered payment obligations to plaintiffs under the change-in-control employment

2   contracts.[36]   In other words, plaintiffs are arguing that the same event that triggered the

3   extinguishing of the change-in-control employment contracts under 12 C.F.R. § 563.39 also

4   vested plaintiffs' rights to payment under those contracts.[37]   The problem with such an

5   argument is that it is directly contrary to the plain language of 12 C.F.R. § 563.39 and is

6   directly contrary to an on-point, dispositive, binding decision by the Ninth Circuit Court of

7   Appeals.

8       The Regulation is Clear:  The regulation was written in apparent contemplation of the

9   precise argument plaintiffs have made, and the drafters wrote the regulation to foreclose any

10  argument that "the tie goes to the runner" (and that employees are the runners).  Specifically,

11  the regulation, in its last line, states that only "rights of the parties that have **_already vested_** …

12  shall not be affected by such article [i.e., shall not be extinguished]."  12 C.F.R. § 563.39 (last

13  sentence).  In short, where the triggering event for the entitlement to payment is the same

14  triggering event that causes the extinguishing of employment contracts, the employees have no

15  entitlement because their payment entitlements were not "already vested" prior to the OTS

16  seizure.

17

18

---

19  [36]  Amended Complaint, Case No. C09-0504, ¶¶ 19-27.  Plaintiffs also appear to be implying that, in addition to
20  the seizure of WMB, tentative discussions between JPMorgan Chase and the FDIC during the days leading up
    to WMB's failure about what would happen to WMB's assets if WMB failed constituted a change-in-control event
21  under the change-in-control employment contracts.  *See id.*, ¶¶ 20-21.  Such discussions clearly do not constitute a
    change-in-control as defined in the employment contracts.  Instead, even if, prior to the OTS issuing Order No.
22  2008-36, the Receiver and JPMorgan Chase had in place a proposed sale **_contingent on_** the seizure of WMB, such
    agreement would not be a change-in-control event as defined in the employment agreements, for one simple
23  reason:  Neither JPMorgan Chase nor the FDIC had any ownership control over WMB prior to WMB's seizure on
    September 25, 2008.  Until the OTS seized WMB, no federal agency had anything to sell – whether to JPMorgan
24  Chase or any other interested company.  There was nothing illegal about the FDIC prudently preparing for the
    potential failure of WMB.  There is also nothing the FDIC could have done prior to the seizure that would have
25  triggered the change-in-control provisions.

26  [37]  *See, e.g.*, Hutton Complaint, Case No. C09-0528, ¶ 15 ("When the FDIC seized control of WAMU and then
    again when it sold WAMU to JP Morgan Chase, which [sic] constituted a change in control under the contracts.");
    Zalutsky Complaint, Case No. C09-0866, ¶ 18 ("There was a change of control when the Office of Thrift
    Supervision seized WAMU, Inc. [sic] and placed it into receivership with FDIC.").

1    <u>Ninth Circuit Law is Clear</u>:  In light of the clarity of 12 C.F.R. § 563.39 on the issue, it

2    is no surprise that a unanimous Ninth Circuit panel held that plaintiffs in the shoes of the

3    plaintiffs in our 20 cases, do not have an entitlement to payment.   The precise argument

4    plaintiffs here are attempting to make was squarely rejected by the Ninth Circuit in

5    *Modzelewski v. Resolution Trust Corp.*, 14 F.3d 1374 (9th Cir. 1994).   In *Modzelewski*, faced

6    with the exact argument raised by plaintiffs, the Ninth Circuit panel held:

> Modzelewski argues in the alternative that his rights vested at the moment
> the RTC took over.  Another provision of his contract states that, upon a
> change in control of management, Modzelewski is entitled to full benefits
> as if he had reached retirement age.  Thus, Modzelewski asserts that the
> RTC's takeover constituted such a change in control — vesting his rights
> even as they were voided.  By the terms of the regulation, however, all the
> rights terminated upon the RTC's appointment except for "[a]ny rights ...
> that have ***already vested***."  12 C.F.R. § 563.39(b)(5) (emphasis added [by
> the Court]).  ***For Modzelewski's argument to work, his right would have
> had to vest <u>before</u> the RTC took over***.  As we hold above, they had not.

14  F.3d at 1378-79 (first emphasis in original; second emphasis added).   *Modzelewski*

conclusively confirms that plaintiffs' claims against the Receiver fail as a matter of law.   And

*Modzelewski* does not stand alone.   The Ninth Circuit endorsed its ruling in *Modzelewski* in

*Aronson v. Resolution Trust Corp.*, 38 F.3d 1110 (9th Cir. 1994):

> "[A] right is vested when the employee holding the right is entitled to
> claim ***immediate payment***."

38 F.3d at 1113 (quoting *Modzelewski*; emphasis in original).[38]   The issue in *Aronson* was

---

[38]    And, equally compelling, the OTS has also resoundingly endorsed the Ninth Circuit's application of
Section 563.39.  Since 1994, when *Modzelewski* was decided, the OTS has amended or revisited 12 C.F.R. § 563
at least twelve times.  *See* 59 F.R. 53568-02 (Oct. 25, 1994); 60 F.R. 35286-01 (July 6, 1995); 60 F.R. 66714-01
(Dec. 26, 1995); 61 F.R. 575-04 (Jan. 8, 1996); 61 F.R. 6100-01 (Feb. 16, 1996); 61 F.R. 45684-01 (Aug. 29,
1996); 62 F.R. 6449-02 (Feb. 12, 1997); 63 F.R. 51272-01 (Sept. 25, 1998); 64 F.R. 2805-01 (Jan. 19, 1999);
66 F.R. 65817-01 (Dec. 21, 2001); 68 F.R. 25090-01 (May 9, 2003); 75 F.R. 44656-01 (July 28, 2010).  But not
once has the OTS made any changes, despite these twelve opportunities, to alter Section 563.39 in order to avoid
the interpretation in *Modzelewski*.  When a court interprets a statute or regulation and then Congress or the
regulatory authority revisits that statute or regulation and leaves the court's interpretation intact, that constitutes
Congressional or regulatory approval of the court's interpretation.  *See Lorillard v. Pons*, 434 U.S. 575, 581
(1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt
that interpretation when it re-enacts a statute without change").

RECEIVER'S MOTION TO DISMISS - 23
Master File No. C09-0504-RAJ

DLA PIPER LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1   whether plaintiff was entitled to payment of benefits under his employment contract with a

2   failed institution that was taken over by the RTC.  The *Aronson* court focused on whether

3   plaintiff was entitled to "immediate payment" of the claimed amount before the RTC took over

4   his former employer.  Citing *Modzelewski*, the Court found that he was not, and dismissed

5   plaintiff's claims.  *Aronson*, 38 F.3d at 1113 (because plaintiff was not entitled to "immediate

6   payment" at the time the RTC took over his former employer, "as a matter of law, his rights to

7   such payments did not vest within the meaning of 12 C.F.R. § 563.39(b), and the RTC properly

8   denied Aronson's claim").

9       Under Section 563.39 and squarely on-point and dispositive Ninth Circuit case law,

10   plaintiffs' change-in-control employment contract claims here fail as a matter of law.  Not a

11   single plaintiff was entitled to benefits under any of the employment contracts underlying this

12   lawsuit ***before*** WMB failed and was seized by the OTS on September 25, 2008.[39]

13      Courts in other circuits also consistently hold, as the Ninth Circuit unambiguously held

14   in *Modzelewski* and *Aronson*, that contingent employee benefits do not "vest" within the

15   meaning of the Automatic Termination Provision of Section 563.39 at the moment of thrift

16   failure, and that for a right to be vested, the triggering event would have to have occurred ***prior***

17   ***to*** failure.

18      For example, in *Augienello v. Coast-to-Coast Fin. Corp.*, Case No. C-11608, at *3-4,

19   2002 WL 1822926 (S.D.N.Y. 2002), *aff'd*, 64 Fed. Appx. 820 (2d Cir. 2003), the district court

20   dismissed employee benefit receivership claims because the employees had not been

21   ─────────────────────

22   [39]  The few plaintiffs with Severance Plan Agreements that have payment triggers when the employee's position is
    "eliminated because of corporate restructuring, downsizing, or a reduction in force[,]" might similarly argue that

23   WMB's failure/OTS seizure resulted in the elimination of their position, thus triggering payment obligations.  *See,
    e.g.*, Keehnel Decl., Ex. D ¶ 2.3 (Plaintiff Bjorklund's Severance Plan Agreement).  The courts have squarely

24   rejected such arguments.  For example, in *Fleisher v. Federal Deposit Ins. Corp.*, 113 F.3d 168 (10th Cir. 1996),
    plaintiff claimed he was entitled to severance benefits because his former thrift employer's failure constituted "a

25   reduction in work force[,]" which plaintiff argued triggered his right to benefits under his severance agreement.
    The Tenth Circuit rejected the argument, and held that plaintiff's employment was terminated by operation of law

26   under Section 563.39, rather than through a work force reduction, and that his severance pay claim was properly
    disallowed.  *Id.* at 172; *see also Romines*, 73 F.3d at 1464 (employee had no "unconditional" or "immediate" right
    to severance benefits as the time of thrift failure, so plaintiff's claim was properly denied under Section 563.39).

1   terminated without cause ***prior to*** takeover, and no "change of control" had occurred ***prior to***

2   takeover.  As a result, the court held, the employees asserting claims had no vested right to

3   benefits.  *See also Crocker*, 839 F. Supp. at 1295-96 (Section 563.39 termination is not

4   termination "without cause," and did not create a vested claim); *Barnes v. Resolution Trust*

5   *Corp.*, 1992 WL 25203, at *4 (D. Kan. 1992) (same); *Borodinsky v. Resolution Trust Corp.*,

6   Case No. C09-2606, 1992 WL 5218, at *3, 5 (D.N.J. 1992) (Section 563.39 termination is not a

7   "lay-off" creating vested right to severance pay); *Federal Sav. & Loan Ins. Corp. v. Quinn*, 711

8   F. Supp. 366, 378-79 (N.D. Ohio 1989), vacated on other grounds, 922 F.2d 1251 (6th Cir.

9   1991) (since no "triggering event" occurred prior to Section 563.39 termination, no benefits

10   were vested); *accord Wilde v. First Fed. Sav. & Loan Ass'n*, 134 Ill. App.3d 722, 730-31 (Ill.

11   Ct. App. 1985) (employee's contingent right to severance if terminated without cause did not

12   "vest" when his contract was terminated under Section 563.39).

13   Because the Ninth Circuit's ruling in *Modzelewski* is squarely on point (and courts

14   around the country are in accord), plaintiffs' claims in this consolidated lawsuit are barred by

15   12 C.F.R. § 563.39.  Under that provision, plaintiffs' employment contracts with the former

16   WMB terminated as a matter of law on September 25, 2008, when WMB was seized by the

17   OTS.  Plaintiffs' change-in-control employment contract claims must be dismissed.  The *only*

18   *way* plaintiffs would be entitled to payment under any of their employment contracts with

19   WMB is if their right to payment existed (*i.e.*, vested) ***prior to*** September 25, 2008.

20   
            b.    Plaintiffs' Entitlement To Change-In-Control Employment
21                 Benefits Did Not Vest In April 2008

22   Facing the threat of dismissal under *Modzelewski*, plaintiffs now allege that their

23   change-in-control employment contract benefits somehow vested in April 2008.  Plaintiffs

24   contend that there was a change-in-control in April 2008 when "WMB announced that it raised

25   $7 billion of additional capital" in an equity transaction with TPG Capital.[40]   Plaintiffs are

26   
---

[40]  Amended Complaint, Case No. C09-0504, ¶ 13.

RECEIVER'S MOTION TO DISMISS - 25
Master File No. C09-0504-RAJ

1   wrong in asserting that a change-in-control occurred in April 2008, and the fact that plaintiffs

2   are wrong is shown by the very contract on which plaintiffs rely, *i.e.*, the April 2008 contract

3   with TPG by which Washington Mutual, Inc. (not WMB) sold stock.

4       The starting point for understanding why plaintiffs' contention fails as a matter of law

5   is, of course, the employment contract that defines what is (and what is not) a change-in-

6   control. Plaintiffs rely on Definition No. 1 of the Change-In-Control Agreements for purposes

7   of this analysis. Definition No. 1 provides:

8       (g) For purposes of this Agreement, "Change in Control" shall mean:

9       1.  **The acquisition of ownership, directly or indirectly,**
        **beneficially or of record, by any Person or group** (within the meaning
10      of the Securities Exchange Act of 1934 and the rules of the Securities and
        Exchange Commission thereunder as in effect on the date of this
11      Agreement), other than Washington Mutual, Inc., a subsidiary or any
        employee benefit plan of Washington Mutual, Inc. or its Subsidiaries, **of**
12      **shares representing more than 25% of (i) the common stock of**
        **Washington Mutual, Inc., (ii) the aggregate voting power of**
13      **Washington Mutual, Inc.'s voting securities or (iii) the total market**
        **value of Washington Mutual, Inc.'s voting securities**;

14      ...[41]

15

16      While plaintiffs make a conclusory allegation that the TPG transaction "satisfied

17  definition one" of the Change-In-Control Agreements, plaintiffs' Amended Complaint does not

18  contain a single word of explanation, or allegation, regarding how the TPG transaction

19  supposedly exceeded the 25% threshold stated in Definition No. 1.

20      Here, we are fortunate that the TPG contract referenced and relied on in the Amended

21  Complaint is easily accessible from the SEC, where it was filed by WMI.[42] Quick reference to

---

22  [41]  *See* Freilinger Change-In-Control Agreement attached as Exhibit C to the Keehnel Declaration, at § 5(g)
23  (emphasis added).

24  [42]  Plaintiffs refer to and rely on the TPG Partners Investment Agreement with Washington Mutual, Inc. in
    connection with this argument. *See* Amended Complaint, Case No. C09-0504, ¶¶ 13-16. A copy of that
    agreement was filed with the Securities and Exchange Commission as Exhibit 10.1 to Washington Mutual, Inc.'s
25  Form 8-K, dated April 11, 2008. The relevant portions of that Form 8-K are attached as Exhibit S to the Keehnel
    Declaration. The Receiver respectfully requests that the Court consider that agreement on this Rule 12 motion
26  without converting this motion to a motion for summary judgment because it is specifically referred to and relied
    upon in the Amended Complaint and because it was filed with the SEC. *See Coto Settlement*, 593 F.3d at 1038
    (the Court may consider materials referenced in a complaint on a motion to dismiss, and the doctrine of

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1   the TPG contract, along with elementary math, shows that the TPG transaction was roughly at

2   19% (not the requisite 25%) of the test stated in Definition No. 1.

3       As plaintiffs allege, and as substantiated by the TPG contract, TPG purchased

4   176,000,000 shares of WMI common stock.[43]  But what plaintiffs avoid alleging – because the

5   fact eviscerates plaintiffs' argument – is the number of shares on the market at the time of the

6   TPG transaction.  The TPG contract, at ¶ 2.2(b), provides that figure.  As the TPG contract

7   shows, when the investment was made, WMI had 882,140,637 shares of common stock

8   outstanding.  Thus, at most, TPG acquired only 19.9% of WMI's common stock (176,000,000 /

9   882,140,637 = 19.9%), not 25%.[44]  The transaction document on file with the SEC proves that

10   the April 2008 transaction was not a triggering event under Definition No. 1 relied on by

11   plaintiffs.  Yet plaintiffs include in their Amended Complaint the legal conclusion that the TPG

12   transaction constituted a change-in-control event under the at-issue contracts.  What is the

13   Court to do with this conflict between a crisp document that is referred to and relied on by

14   plaintiffs and plaintiffs' erroneous legal conclusion?  While it is generally the case that

15   allegations in a complaint must be taken as true, the Court is not  to "accept as true allegations

16   that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."

17   *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  Furthermore, "[t]he

18   court need not … accept as true allegations that contradict matters properly subject to judicial

19   notice or [properly before the Court] by exhibit."  *Id.*; *Thompson v. Illinois Dep't. of Prof'l.*

20   *Regulation*, 300 F.3d 750, 754 (7th Cir. 2002) ("[W]hen a written instrument contradicts

21

22   incorporation extends to "documents in situations where the complaint necessarily relies upon a document or the
  contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no

23   disputed issues as to the document's relevance"); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n. 2 (9th Cir. 2006)
  (SEC filings appropriate for consideration on Rule 12 motion).

24   [43]  Amended Complaint, Case No. C09-0504, ¶ 13; TPG contract, ¶ 2.2(b) (Keehnel Decl. Ex. S).

25   [44]  Plaintiffs' reference to TPG's right to purchase 55,000 shares of preferred stock does not change the analysis.
  *See* Amended Complaint, Case No. C09-0504, ¶ 14.  <u>First</u>, the pertinent inquiry is the particular transaction in

26   WMI's *common* stock, not its *preferred* stock, as is clear from Definition No. 1.  <u>Second</u>, plaintiffs do not and
  cannot allege that conversion from preferred stock to common would bridge the gap between the actual 19.9% and
  the triggering 25%.

1   allegations in a complaint to which it is attached, *the exhibit trumps the allegations*.")

2   (emphasis in original).

3        While the TPG transaction document, by itself, requires dismissal of plaintiffs' claim

4   based on the false predicate of an April 2008 triggering event, plaintiffs also ignore the fact that

5   for their rights to have "vested" under nearly every one of the change-in-control employment

6   contracts, not only must there have been a change-in-control (which there was not), but

7   plaintiffs must have also been ***terminated***.[45]   None of the plaintiffs has alleged, or can allege,

8   that they were terminated prior to the OTS's issuance of Order No. 2008-36 (*i.e.*, prior to the

9   automatic termination of their change-in-control employment contracts pursuant to 12 C.F.R.

10  § 563.39.).   Thus, even if there had been a change-in-control in April 2008 (there plainly was

11  not), plaintiffs' rights under the at-issue agreements still had not vested – ***they had not been***

12  ***terminated, which was also a precondition to vesting***.   Therefore, plaintiffs still would not be

13  entitled to the change-in-control employment contract benefits they seek through this

14  consolidated lawsuit.[46]

15       Plaintiffs' assertion that there was a change-in-control triggering event in April 2008

16  fails as a matter of law.   Plaintiffs' entitlement to benefits under their change-in-control

17  employment contracts did not vest prior to WMB's failure, and OTS's seizure of WMB on

18  September 25, 2008.

19

20

21

22

---

23  [45] *See*, *e.g.*, Freilinger Change-In-Control Agreement attached as Exhibit C to the Keehnel Declaration, at § 5(c).

24  [46]  Plaintiffs also make a fleeting and conclusory reference to the purported fact that, around April 2008, some
    employees (not parties to this lawsuit) received payments based on their employment contracts, which plaintiffs

25  imply are similar to the employment contracts on which plaintiffs base their claims.  *See* Amended Complaint,
    Case No. C09-0504, ¶ 18.  Those other employees' contracts are not before this Court and have nothing to do with

26  this consolidated lawsuit.  There could have been any number of reasons WMB's management decided to pay
    former employees (if that even happened) *while WMB was still in business*.  That has nothing to do with whether
    plaintiffs' claims are barred by Section 563.39.

RECEIVER'S MOTION TO DISMISS - 28
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1

2

        3.    <u>All Of Plaintiffs' Alleged Causes Of Action Arising Out Of The Change-</u>
<u>In-Control Employment Contracts Should Be Dismissed With Prejudice</u>
<u>On This Rule 12 Motion</u>

3

4

      Plaintiffs assert numerous causes of action based on the change-in-control concept, and every cause of action asserted by plaintiffs should be dismissed on this Rule 12 Motion.

5

6

7

8

9

10

11

12

      ***Breach of Contract Claims***.  All plaintiffs assert a breach of contract claim against the Receiver, alleging the Receiver breached each plaintiff's respective change-in-control employment contract(s) with WMB by not paying the employment benefits sought under those contracts.  Plaintiffs' contract breach claims fail for the reasons discussed in Part III.B., above — *i.e.*, as a matter of law, none of the plaintiffs is contractually entitled to the change-in-control employment benefits they seek through this lawsuit, because none of the plaintiffs' claimed "entitlements" vested prior to the contracts being automatically extinguished by the OTS's actions.

13

14

15

16

17

18

19

20

21

22

23

24

25

      ***Wrongful Withholding of Wages Claims***.   Some plaintiffs assert a wrongful withholding of wages cause of action, claiming "[t]he monies due and owing from the change of control agreements constitute wages already earned by the plaintiffs."[47]  Because the wage-withholding claims are based on the same alleged entitlement to employment benefits as the breach of contract claims, they fail for the same reason — *i.e.*, as a matter of law, none of the plaintiffs is entitled to employment benefits under the extinguished agreements.  Because plaintiffs are not entitled to the "wages" they seek, there can be no "wrongful withholding" of such "wages."  *See Stevenson v. United Subcontractors, Inc*., No. C08-5558, 2008 WL 5114270, at *3 (W.D. Wash. Dec. 2, 2008) (dismissing wrongful withholding claim where there was no breach of the employment agreement and no benefits or compensation were owed); *Pope v. Univ. of Washington*, 121 Wn.2d 479, 490, 852 P.2d 1055 (1994) (holding no wrongful withholding of wages as a matter of law because federal law made clear that plaintiff was not entitled to the alleged wrongfully withheld wages).

26

---

[47]  Koro Complaint, Case No. C09-0553, ¶ 20.

RECEIVER'S MOTION TO DISMISS - 29
Master File No. C09-0504-RAJ

*Conversion Claim*.  One plaintiff alleges conversion, claiming the Receiver "withheld [plaintiff's] property ..., by using the monies owed to [plaintiff] for some other use...."[48]  But because, as a matter of law, the plaintiff had no right to the monies he alleges were "converted," plaintiff's conversion claim fails as a matter of law.  *See Kruger v. Horton*, 106 Wn.2d 738, 743, 725 P.2d 417 (1986) ("The plaintiff in a conversion action must prove a right to possess the property converted.").

*Contract Clause Claim*.  One plaintiff alleges the Receiver's refusal to pay under the employment contracts "violat[es] the contracts clause of the United States Constitution."[49]  But for there to be a violation of the Contract Clause, plaintiff must have had a valid contract right that was violated.  *See Robertson v. Kulongoski*, 359 F. Supp.2d 1094, 1099 (D. Or. 2004) ("If there is no contract [claim], then the Contract Clause does not protect those benefits.")  Plaintiff did not have such a contract right.  The Automatic Termination Provision of Section 563.39 was a term in plaintiff's change-in-control employment contract.[50]  That term provided that the moment the OTS issued Order No. 2008-36, plaintiff's employment contract automatically terminated and *only vested rights* survived termination of the contract.  Because no rights vested prior to termination, the Receiver did not infringe on any of plaintiff's contract rights and, therefore, did not engage in an unlawful taking of property.  What plaintiff is implicitly arguing here is that Congress cannot enact legislation, and the OTS cannot issue regulations, that limit a financial institution's *future* contracts with executives.  That is a bald (and unfounded) position that, if correct, would essentially end regulations of U.S. capital markets.  It is not surprising that the courts have soundly rejected that argument.[51]

---

[48]  Freilinger Complaint, Case No. C09-0692, ¶ 44.

[49]  Zalutsky Complaint, Case No. C09-0866, ¶ 23.

[50]  *See Modzelewski v. Resolution Trust Corp.*, 14 F.3d 1374, 1380 (9th Cir. 1994) ("If an employment contract fails to contain [12 C.F.R. 563.39], it is read into the contract as an implied term").

[51]  Statutes such as FIRREA, and regulations under the authority of such statutes, do not violate the Contract Clause of the United States Constitution.  *See SCFC ILC Inc. v. Visa U.S.A. Inc.*, 763 F.Supp. 1094, 1097 n.7 (D. Utah 1991), *vacated on other grounds by* 936 F.2d 1096 (10th Cir. 1991).

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1    ***Takings Claims***.   Several plaintiffs allege the Receiver's refusal to pay under the

2    change-in-control employment contracts constitutes a taking of property in violation of the

3    United States Constitution.[52]   For the same reason the Contract Clause argument fails,

4    plaintiffs' unlawful taking of property claim fails.   Again, for there to be an unlawful taking of

5    property, the party asserting the claim must first establish he or she had a right to that property.

6    *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465

7    (1985).   Again, by the terms of plaintiffs' own employment contracts, they did not have a right

8    to the change-in-control employment benefits they seek to recover through this consolidated

9    lawsuit.   Section 563.39, as an implied term of each employment contract, resulted in the

10   termination of the employment contracts before any property rights vested under the contracts,

11   and so there was no taking of property.   Mandating that Section 563.39 be an implied term in

12   plaintiffs' employment contracts was clearly within the regulators' authority.   *See National*

13   *R.R.*, 470 U.S. at 476-77 ("Congress remained free to adjust the burdens and benefits of

14   economic life, as long as it did so in a manner that was neither arbitrary nor irrational"); *see*

15   *also Federal Deposit Ins. Corp. v. Shain, Schaffer & Rafanello*, 944 F.2d 129, 136 (3d Cir.

16   1991) (FIRREA and regulations thereunder do not violate the Takings Clause).

17   ***Estoppel Claims Based on Washington Mutual Bank's Employment Contracts***.

18   Plaintiffs in three lawsuits assert estoppel as a cause of action based on "Washington

19   Mutual['s] representations to Plaintiffs that they would receive a change of control bonus bonus

20   [sic] in the event that their employment was terminated."[53]   In other words, these plaintiffs

21   allege the Receiver is estopped from denying their employment benefits claim because WMB

22   allegedly promised, through their employment contracts, payment on such claims.[54]   Again,

23   plaintiffs' employment contracts terminated by operation of law before any amounts were due

---

[52]  *See, e.g.,* Amended Complaint, Case No. C09-0504, ¶¶ 53-54.

[53]  *See, e.g.,* Du Bey Complaint, Case No. C09-0711, ¶ 30.

[54]  As the Court can see, this "cause of action" is really nothing more than a mislabeled breach of contract claim. For the sake of argument, however, the Receiver will treat it as it is designated – *i.e.*, as an "estoppel" claim.

RECEIVER'S MOTION TO DISMISS - 31
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1  under those contracts.[55]  Thus, by operation of law, no "representations" were made that were

2  contradicted, and this "estoppel" claim fails as a matter of law.

3       ***Estoppel Claims Based on the Receiver's Basis for Rejection***.   In three lawsuits,

4  plaintiffs assert estoppel based on the theory that the Receiver allegedly provided inconsistent

5  reasons for denying plaintiffs' claims.  <u>First</u>, that is simply false.  The Receiver has been

6  consistent in its position that plaintiffs' claims fail as a matter of law.[56]  <u>Second</u>, any statement

7  of reasons the Receiver determined not to pay the demanded sums is irrelevant for purposes of

8  this Motion.  The fact is, the moment WMB failed, plaintiffs' employment contracts terminated

9  by operation of law, and any subsequent explanation by the Receiver for why plaintiffs' claims

10  fail cannot nullify the termination of those contracts.

11       ***Claims That Repudiation Did Not Occur Within a "Reasonable" Time***.   Three

12  complaints allege the Receiver did not repudiate plaintiffs' employment contracts within a

13  "reasonable" time.  The Automatic Termination Provision of Section 563.39 terminated all of

14  plaintiffs' employment contracts with WMB immediately, and by operation of law, the moment

15  OTS Order No. 2008-36 was issued on September 25, 2008.  The employment contracts at

16  issue in this consolidated lawsuit did not need to be repudiated for plaintiffs' claims to fail as a

17  matter of law.

18       All of plaintiffs' alleged causes of action arising out of plaintiffs' change-in-control

19  employment contracts fail as a matter of law and should be dismissed on this Rule 12 motion.[57]

---

20

21  [55]  As explained above, Section 563.39 applies as a matter of law whether or not the employment agreements expressly include its language.  *See Modzelewski*, 14 F.3d at 1380 ("If an employment contract fails to contain [12 C.F.R. 563.39], it is read into the contract as an implied term").

22

23  [56]  *See, e.g.*, Freilinger Complaint, Case No. C09-0692, ¶18, Ex. B (Notice of Disallowance of Claim (plaintiff's claim fails because "Washington Mutual Bank's failure was an act of law")).

24  [57]  Section 563.39's 35-year history confirms the appropriateness of dismissing plaintiffs' claims.  Barring claims such as the claims plaintiffs assert here is precisely what Section 563.39 was (in 1974) and is (today) designed to do.  In the 35 years since Section 563.39 was promulgated, Congress has never indicated any displeasure with its Automatic Termination Provision.  If anything, Congress' conduct suggests the regulation does not go far enough.

25  Congress continues to enact statutes and endorse regulations that are designed to curb windfall payouts to high-level employees of failed financial institutions.  Here, United States taxpayers and millions of shareholders of the now nearly-valueless Washington Mutual, Inc. (whose largest asset was WMB) have had foisted on them the loss

26  of the failed WMB (which many argue failed due to poor management).  Nevertheless, plaintiffs, who are high-

**C.      The SERAP Claims Fail As A Matter Of Law**

In the Amended Complaint, 35 plaintiffs seek payment from the Receiver under the Washington Mutual, Inc. Supplemental Executive Retirement Accumulation Plan.  These new SERAP claims fail as a matter of law.  The SERAP claims are breach of contract claims.[58]  For breach of contract claims to survive a Rule 12 dismissal motion, there must be a binding contract between plaintiff and defendant and a breach of that contract.  *See Lease Crutcher Lewis WA, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*, Case No. C08-1862, 2009 WL 3444762, at *4 (W.D. Wash. Oct. 20, 2009) (granting motion to dismiss breach of contract claim because plaintiffs showed only the existence of a contract with a third party, and not the defendant); *see also Lehrer v. Dep't of Soc. & Health Servs.*, 101 Wn. App. 509, 516, 5 P.3d 722 (2000) ("Generally, a plaintiff in a contract action must prove a valid contract between the parties, breach, and resulting damage." (citation omitted)).  Contrary to the SERAP plaintiffs' bald assertion, WMB (and, therefore, the Receiver) never had a contract under which WMB was to be obligated to these plaintiffs under the SERAP.  Rather, the SERAP is a benefit plan

---

level management employees of the former WMB, appear to take no responsibility and are seeking substantial cash payouts from the receivership assets of that failed thrift.  Surely if Congress wanted claimants such as plaintiffs in this lawsuit to receive the payments they seek, Congress would have enacted legislation to abrogate Section 563.39 (or narrow its scope), and thrift regulators would not have been required to apply it with diligent force for 35 years.  But that is not what happened.  To the contrary, Congress continues to enact statutes that empower regulators to promulgate further regulations to curb the type of windfall payouts that plaintiffs seek through this consolidated lawsuit.  Congress and federal regulators have uniformly and consistently worked hard to ensure such payouts are not made.  This Court should defer to clear Congressional intent and grant this Motion.

[58]   *See* Amended Complaint, Case No. C09-0504, ¶ 84 ("FDIC's failure to fund SERAP for calendar year 2008 breaches the SERAP Plaintiffs' agreements with WMB").  The Receiver acknowledges that the SERAP plaintiffs casually state that the Receiver's "breach" of the SERAP agreement "unjustly enriches FDIC," but these plaintiffs do not allege a cause of action for unjust enrichment.  *See* Amended Complaint, Case No. C09-0504, ¶ 84.  Even if these plaintiffs did allege an unjust enrichment cause of action, such a claim would also fail as a matter of law, for these plaintiffs do not and cannot provide any separate substantive allegations to support an unjust enrichment claim.  An unjust enrichment claim would be superfluous and entirely duplicative of the purported breach of contract claim.  As a matter of law, plaintiffs cannot pursue an unjust enrichment claim that is merely duplicative of their other claims.  *See Zango, Inc. v. PC Tools Pty LTD.*, 494 F. Supp. 2d 1189, 1195 (W.D. Wash. 2007) ("Although plaintiff also alleges general 'injunctive relief' and 'unjust enrichment' as separate causes of action, it does not argue that these are independent of the three other claims, and the Court will not treat them as such."); *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1041 (9th Cir. 2010) ("[u]njust enrichment is essentially another way of stating a tort claim and, consequently, once the underlying tort claim is dismissed, so is the unjust enrichment claim"; affirming dismissal of plaintiff's unjust enrichment claim, which appeared to be an "echo" of its conversion claim).

RECEIVER'S MOTION TO DISMISS - 33
Master File No. C09-0504-RAJ

1  extended by Washington Mutual, **Inc.** to certain WMI employees and extended by Washington

2  Mutual, **Inc.** to some WMI-affiliate employees.   In short, the SERAP claims should be

3  dismissed with prejudice because plaintiffs sued the wrong party.

4       WMI's SERAP plan is Exhibit 10.9 to Washington Mutual, Inc.'s Form 10-K for the

5  period ending December 31, 2004, which was filed with the Securities and Exchange

6  Commission on March 14, 2005.[59]   The plan documents clearly show that the SERAP is a

7  Washington Mutual, **Inc.** benefit plan that was offered to certain employees of Washington

8  Mutual, Inc. and its affiliated companies.   After defining "Company" as "Washington Mutual,

9  Inc." (SERAP at ¶ 2.5), the SERAP provides as follows:

10
11
     The Supplemental Executive Retirement Accumulation Plan ("SERAP") was established effective January 1, 1996 by the Compensation and Stock Option Committee of the Board of Directors **of Washington Mutual, Inc**….

12
13
14
     1.1.     Purpose.   The purpose of this Plan is to provide retirement benefits to certain executive employees of the Company and its affiliates that supplement the benefits accrued under the Retirement Plans.

…

15
16
17
     1.3.     Unfunded Plan.   This Plan is established as an unfunded plan of deferred compensation.…   **All Plan benefits are payable solely from the general assets of the Company**.   **Participants and Beneficiaries** shall have no legal or equitable rights, interest or claims in any specific

18
19
20
21
22
23
24
25
26
[59]   The relevant portions of this SEC filing, including Washington Mutual, Inc.'s SERAP plan documentation, are attached as Exhibit Q to the Keehnel Declaration.   The SERAP is specifically referenced and relied upon in the Amended Complaint.   Amended Complaint, Case No. C09-0504, ¶¶ 80-84.   Thus, the Court may consider the SERAP documentation on this Rule 12 motion without converting it to a motion for summary judgment.   *See Coto Settlement*, 593 F.3d at 1038 (the Court may consider materials referenced in a complaint on a motion to dismiss, and the doctrine of incorporation extends to "documents in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance"); *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (in order to prevent plaintiffs from defeating motions to dismiss by deliberately omitting documents upon which their claims are based, "a court may consider a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned"); *McGuire v. Dendreon Corp.*, Case No. C07-0800MJP, 2008 WL 1791381, at *4 (W.D. Wash. Apr. 18, 2008) (on a Rule 12 motion, the Court may consider "documents that are referenced by the plaintiff in the complaint and whose authenticity are not in dispute" without converting the motion to a motion for summary judgment). Because the SERAP is specifically referenced and relied upon in the Amended Complaint, the Receiver respectfully requests the Court consider the SERAP plan documents without converting this motion into a motion for summary judgment.   The fact that this plan documentation was filed with the SEC further supports consideration of these materials on this motion.   *See Dreiling v. American Express Co.*, 458 F.3d 942, 946 n. 2 (9th Cir. 2006) (SEC filings appropriate for consideration on Rule 12 motion).

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1

collateral, property or assets of the Company, but **shall be general unsecured creditors of the Company** until benefits are paid hereunder....

2

SERAP at 3 (Preamble, ¶¶ 1.1 and 1.3) (emphasis added) (Keehnel Decl. Ex. Q).

3

4

Plainly, the SERAP establishes that only WMI, not WMB, was an obligor on SERAP.

5

After all, the SERAP plan is explicit that "[a]ll Plan benefits are payable **solely** from the

general assets of **the Company [i.e., WMI]**." The Court is thus confronted (<u>again</u>) with a

6

document that shows the SERAP plaintiffs' legal conclusion asserted in ¶ 80 of the Amended

7

Complaint ("plaintiffs have a binding [SERAP] agreement with WMB") to be plainly false.

8

What is the Court to do?  Again, the Court is not to "accept as true allegations that are merely

9

conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell*, 266 F.3d at

10

988.  And "[t]he court need not ... accept as true allegations that contradict matters properly

11

subject to judicial notice or [properly before the Court] by exhibit." *Id.*; *Thompson*, 300 F.3d at

12

754 ("[W]hen a written instrument contradicts allegations in a complaint ..., *the exhibit trumps*

13

*the allegations*.") (emphasis in original).

14

Thus, the SERAP plan document, properly before the Court on this Motion, "trumps the

15

allegations" – if we can even label plaintiffs' legal conclusion as an allegation.  In short, the

16

SERAP plaintiffs' false legal conclusion – shown to be false by the face of the SERAP Plan –

17

is to be disregarded; the plaintiffs' SERAP claims against the Receiver (standing in WMB's

18

shoes) must be dismissed; and plaintiffs should pursue their SERAP claims against the proper

19

party, WMI.

20

Indeed, certain of plaintiffs' own filings in the Washington Mutual, Inc. bankruptcy

21

proceeding in the United States District Court for the District of Delaware, Case No. 08-12229-

22

MFW, show that these plaintiffs are well aware that WMI, not WMB, is contractually

23

responsible for the claimed SERAP benefits.[60]  Attached as parts of Exhibits A, B and E to

24

---

25

[60]  Although not necessary for this Court's ruling on this Rule 12 dismissal motion (for the SERAP plan documents plainly establish that the SERAP is not the obligation of WMB, and therefore not the obligation of the Receiver), the fact that certain plaintiffs are pursuing their SERAP benefit claims in the WMI bankruptcy proceeding is compelling.  To the extent the Court is inclined to do so, the Court can consider these court filings on this Rule 12 motion without converting it to a motion for summary judgment.  *See MGIC Indemnity Corp. v.*

26

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1   Docket No. 89, filed in this action in connection with plaintiffs' motion for leave to amend their

2   complaints, are Proof of Claim Forms by plaintiffs Mike Brandeberry, Jeffrey Deuel, and

3   Catherine Killien in the Washington Mutual, Inc. bankruptcy proceeding.[61]  These bankruptcy

4   claims by Brandeberry, Deuel, and Killien seek payment of SERAP benefits from the trustee of

5   Washington Mutual, Inc.  Each claimant checked as the debtor responsible for their SERAP

6   benefits, "Washington Mutual, Inc." *and signed their claim under penalty of perjury*.

7   Furthermore, attached as an exhibit to Ms. Killien's bankruptcy filing is a statement by

8   Ms. Killien, again made under penalty of perjury, in support of her claim.  In that statement,

9   Ms. Killien, a former senior lawyer at WMB, states:

> Washington Mutual Bank was seized by the FDIC and certain of its assets and
> liabilities subsequently sold to JPMorgan Chase Bank, N.A. ("JPMC") on
> September 25, 2008.
>
> **The SERAP is a benefit plan of Washington Mutual, Inc.**  My employment
> was terminated January 1, 2009.  JPMC is taking no responsibility for payment of
> the benefits accrued under the SERAP for the year 2008 and **I seek a payment
> those [sic] benefits from Washington Mutual, Inc.**

*See* Dkt. No. 89, Ex. E (emphasis added) (also attached as Ex. R to the Keehnel Decl.).

Plainly, as these plaintiffs themselves admit under penalty of perjury, the SERAP

program is an obligation of Washington Mutual, Inc., not WMB and not the Receiver.

Plaintiffs have not alleged and cannot allege a viable breach of contract claim against the

Receiver for SERAP benefits.

The SERAP claims by 35 of the plaintiffs in this consolidated lawsuit against the

Receiver should be dismissed with prejudice.

---

*Weisman*, 803 F.2d 500, 504-05 (9th Cir. 1986) (taking judicial notice of court documents including contents of a memorandum to determine reliance); *Calhoun v. Hook*, Case No. 08-5697-RJB-KLS, 2009 WL 4928048, at *6-7 (W.D. Wash. Dec. 14, 2009) (taking judicial notice of administrative complaints and complaints filed in state and federal court by plaintiff does not convert a Rule 12 motion to a motion for summary judgment).

[61]  For the Court's convenience, copies of these claim forms are attached to the Keehnel Declaration as Exhibit R.

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800

1

**IV.    CONCLUSION**

2

Through this consolidated lawsuit, plaintiffs seek employment benefits to which they

3

are not entitled.  All plaintiffs allege that they had change-in-control employment contracts

4

with the now-failed WMB.  Those contracts provided for contingent benefits under certain

5

defined circumstances.  On September 25, 2008, WMB failed, was seized by the OTS, and was

6

placed into FDIC receivership.  When that happened, all of plaintiffs' change-in-control

7

employment contracts with WMB terminated by operation of law pursuant to 12 C.F.R.

8

§ 563.39.  None of the plaintiffs had any vested rights under those contracts, and so none of the

9

plaintiffs are entitled to payment from the Receiver for employee benefits out of the

10

receivership assets of the former WMB.  About 35 plaintiffs also allege that they are entitled to

11

payment from the Receiver under the Washington Mutual, Inc. SERAP.  But WMB (and,

12

therefore, the Receiver) was never a contracting party under the SERAP; only *WMI* was.  The

13

SERAP plaintiffs' SERAP claims are properly against WMI, not WMB and not the Receiver.

14

Plaintiffs' claims in this consolidated lawsuit fail as a matter of law and should be

15

dismissed with prejudice.

16

Respectfully submitted this 22nd day of October, 2010.

17

18
                              /s/ *Stellman Keehnel*
                              Stellman Keehnel, WSBA No. 9309
                              Russell B. Wuehler, WSBA No. 37941

19
                              DLA PIPER LLP (US)
                              701 Fifth Avenue, Suite 7000

20
                              Seattle, WA  98104-7044
                              Telephone:  206.839.4800

21
                              Fax:  206.839.4801
                              E-mail:  stellman.keehnel@dlapiper.com

22
                                          russell.wuehler@dlapiper.com

23
                              *Counsel for Federal Deposit Insurance*
                              *Corporation, as Receiver for Washington Mutual Bank*

24

25

26

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on October 22, 2010, I caused to be electronically filed the

3

foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

4

such filing to the attorneys of record for the parties.

5

In addition, I caused the foregoing to be served by U.S. Mail and e-mail on *pro se*

6

plaintiff Michael F. Day at the following addresses:

7

8

Michael F. Day
60 Monterey Drive
Tiburon, CA  94920

9

*michael.forest.day@gmail.com*

10

11

Dated this 22nd day of October, 2010.

12

13

*/s/ Russ Wuehler*

14

Russell B. Wuehler

15

EAST\43702144.4

16

17

18

19

20

21

22

23

24

25

26

RECEIVER'S MOTION TO DISMISS - 38
Master File No. C09-0504-RAJ

DLA Piper LLP (US)
701 Fifth Avenue, Suite 7000
Seattle, WA  98104 • Tel: 206.839.4800